Edna M. Barkley et al., appellees, v. Charles W. Pool, Secretary of State, appellee: L. D. Richards et al., Interveners, appellants.

Filed June 28, 1919.   No. 20946.

1. **Statutes:** Initiative and Referendum: Injunction. Under section 2339, Rev. St. 1913, being a part of the initiative and referendum act, any citizen may invoke the remedy by injunction therein provided to enjoin the secretary of state from certifying or printing on the official ballot for the ensuing election the ballot title and number of an act sought to be referred.

2. ————: ————: Petition: Certificate: Impeachment: Effect. When the certificate of a circulator of a referendum petition under the initiative and referendum act is impeached on the ground of fraud, the probative value of such certificate is destroyed, and none of the names appearing on such petition will be counted unless affirmatively proved to be genuine.

Appeal from the district court for Lancaster county: Leonard A. Flansburg, Judge. *Affirmed.*

*Jacob Fawcett, John L. Webster, L. F. Crofoot* and *Byron G. Burbank,* for appellants.

*Francis A. Brogan, T. J. Doyle, John M. Stewart, Elmer E. Thomas, C. A. Sorensen* and *H. H. Wilson, contra.*

Dean, J.

The legislature passed an act, House Roll 222, chapter 30, Laws 1917, that amended section 1940, Rev. St. 1913, so that, as amended, the act conferred upon women the right to vote at the regular state election for officers and upon submitted questions, except such officers as are "specified and designated in the constitution," and except upon questions "the manner of the submission of which is specified and designated in the Constitution of Nebraska." A referendum petition, numerously signed, and apparently having more than the required number of names necessary to invoke the operation of

the referendum statute, was filed in the office of the then secretary of state, on July 23, 1917, to refer the suffrage act to the people for their approval or rejection at the regular state election on November 5, 1918.

Plaintiffs began this action under section 2339, Rev. St. 1913, to enjoin the secretary of state from referring the suffrage act pursuant to the prayer of the referendum petition. When the secretary filed his answer, certain electors intervened and by leave of court were joined as party defendants. As soon as the taking of testimony was closed, the interveners interposed a demurrer to plaintiffs' evidence, which was overruled. Interveners, electing to stand thereon, introduced no further testimony. Whereupon the court found "generally in favor of the plaintiffs and against the interveners, and defendants." The interveners alone appealed.

This case was appealed before and was dismissed by us on the ground that the ruling appealed from was not a final order. It may be added that on the former appeal none of the testimony was before us. *Barkley v. Pool,* 102 Neb. 799.

All of the plaintiffs are women. They sue on behalf of themselves and all others similarly situated. Hence interveners contend that plaintiffs cannot maintain this suit. They submit this argument: "The court should have ruled that the questions involved in this suit do not relate to either property or civil rights, but to political rights, which belong to the electors of the state and attach to the sovereignty of the state, and that a suit in equity of this sort could only be prosecuted in the name of the state, by and through the state legal department."

We do not think the court erred in ruling that plaintiffs could maintain the action. While plaintiffs are not electors, they are of course citizens. Section 2339, Rev. St. 1913, expressly provides that "any citizen" may apply to the district court for a writ of mandamus

to compel the secretary of state to file either an initiative or a referendum petition. The same section provides: "On a showing. that any petition filed is not legally sufficient, the court may enjoin the secretary of state and all other officers from certifying or printing on the official ballot for the ensuing election the ballot title and numbers of such measure." The act provides a remedy that may be invoked when the secretary of state wrongfully refuses to file a petition, and a remedy is also provided against certifying and printing the title of the act on the official ballot when the petition is not legally sufficient. "Any citizen" may apply to the district court to compel a filing when the refusal is wrongful, and, if the showing is that the petition is not legally sufficient, the court must enjoin the secretary of state from certifying and printing the title of the act on the official ballot. It is not necessary to repeat the words "any citizen." Those words are implied and the statute must be so construed. If the legislature intended that either remedy created by the act could be invoked only by the attorney general or by a person belonging to some specially designated class, as distinguished from "any citizen," it could very easily have said so. It is significant that the lawmakers did not say so either in express terms or even by implication.

Ordinarily the powers of a court of equity cannot be invoked to enforce political rights. But section 2339, Rev. St. 1913, expressly provides that injunction will lie to prevent the secretary of state from submitting a referendum petition that is legally insufficient. The question then is: By whom may the action be brought? The act sought to be referred is a grant of certain rights by the legislature to all persons of a certain class, namely, the women of the state. When such grant is assailed, must the class upon whom the rights are so conferred remain passively silent and be denied opportunity to make the defense pointed out by statute? In view of

the act, or on principle, can it be said that any citizen so clothed with statutory rights is remediless? We do not think so.

Interveners cite *Friendly v. Olcott,* 61 Or. 580, which holds that the remedy by injunction, under a statute similar to ours, can only be invoked by the state "through its proper law officer," and argue that, having adopted the Oregon statute, we adopted the construction placed thereon by the Oregon court. This court is not irrevocably committed to that rule. In *Burnham-Munger Root Dry Goods Co. v. Strahl,* 102 Neb. 142, in discussing this point, it is said: "This is not a uniform rule and has been departed from for good reasons by this court on several occasions." As pointed out in oral argument and in briefs of counsel, the construction of the Oregon statute was based on the former practice in that state, and was not, strictly speaking, an independent construction of the statutory language. On principle and in view of our former holding, we decline to adopt the Oregon construction. It may be added that Oregon has preserved the distinctions between actions at law and suits in equity, while in this state such distinctions are expressly abolished by statute. We conclude that under the act any citizen may make a "showing that any petition filed is not legally sufficient" and may invoke the remedy by injunction.

Sections 2337 and 2338, Rev. St. 1913, provide generally for the duties of the circulators of initiative and referendum petitions. Section 2337 provides: "Not more than twenty signatures on one sheet shall be counted." Section 2338 provides that every sheet on such petition shall be verified on the back thereof by the circulator, who shall certify that each signature was signed in his presence, that he believes that the names and addresses are correctly given, and that he believes each signer is a legal voter.

The petitions may contain the signatures of good-faith signers, but plaintiffs proved that the names of

many persons were fraudulently written thereon by three of the circulators, namely, Barclay, Norton, and McCabe. Among other things, the district court found: "That 29,147 legal signatures were necessary, * * * and that there appear on said petition names numbering 3,840 in excess of that number; * * * that considerably more than 3,840 names on said petition * * * are invalidated, and cannot be counted by reason of fraud, forgery, false and defective certificates, signatures of minors or persons who were not electors, signatures procured through false representation of the circulator, and signatures connected with incorrect or fictitious addresses. The court further finds that as to circulator Barclay, 28 of his petitions appeared to be each in the same handwriting; 105 witnesses denied the signatures * * * and most of said 105 signatures are proven to be forgeries." Three purported signatures thereon were names of persons who had previously died. The petitions circulated and certified by Barclay contained in all 2,275 names. "As to the circulator Norton, 172 witnesses deny the genuineness of the signatures purporting to be theirs, on his petitions. The court finds that most of these 172 names are proven to be forgeries;" that he wrote signatures thereon and falsely certified that they were genuine; "that there are 1,306 names on the petitions circulated by Norton." That as to circulator McCabe's petitions, 24 witnesses deny the signatures thereon; that at least 20 are forgeries; "several petitions certified by him appear to be in the same handwriting and, on 32 different petitions, 173 names appear in the handwriting of Mr. McCabe, * * * that upon Mr. Cabe's petitions there are 1,075 signatures." That the oaths and the certificates of these three circulators are impeached for fraud; that numerous certificates by them "were knowingly and intentionally false; and the court has counted out each one of the petitions procured by these circulators in its entirety whenever a false and fraudulent signature has

been proven. The court also finds that as to all petitions of each of these three circulators, where the particular certificate has not been proven false or fraudulent by direct attack upon the signatures covered by the certificates, that nevertheless the certificate, being made by a circulator whose oath has been impeached in this transaction, lacks evidentiary value, and that in order that said petition be counted, if valid, it is necessary to furnish testimonial proof of the genuineness of the signatures and the truthfulness of these certificates, and the burden of making such proof would fall upon the defendants and the interveners herein, and they have failed to offer such proof. The court further finds that, had all false certificates of these circulators been disregarded as being unnecessary to the validity of the petitions, and had all the names on the petitions of these three circulators been assumed by the court, in the absence of proof to the contrary, to be genuine, and had been counted, except only those individual signatures which have been directly proven fictitious or not genuine, that the increase of names thus added to the referendum petition would have brought the number of valid signatures up to the required ten per cent. of the electors of the state, and the referendum petition in that event would necessarily have been sustained.''

The interveners in support of their demurrer to the evidence submit this argument: ''The plaintiffs, from the nature of the action, assume the burden of proving that there are not a sufficient number of genuine signatures of legal voters on the petition to comply with the requirements of the Constitution. This burden of proof is not satisfied by evidence that a circulator was guilty of a particular fraud, or that one or more names on a petition are fictitious. Every genuine signature on the petitions must be counted, irrespective of the certificates of the circulators, and whereas every signer of the petition has signed under a declaration that he is a legal voter and that the signature is his genuine

signature, etc., such signatures must be presumed genuine and counted, except in cases where the plaintiffs have affirmatively shown that the particular signature is false or fraudulent or that the person is not a legal voter within the meaning of the Constitution."

The findings of fact are not controverted.

In view of the proof of fraud, of forgery, and of perjury that was perpetrated by circulators Barclay, Norton and McCabe, and that is in effect admitted by interveners' demurrer to the evidence, their argument cannot prevail. The trial court did not err in finding from the evidence that all certificates of the three circulators were impeached and unworthy of credence. Nor did the court err in refusing, in the absence of proof of the genuineness of any of the purported signatures appearing on such petitions, to count any names thereon for the referendum. The rule is elementary that, when the testimony of a witness on a material point is impeached, all of his testimony may be rejected unless corroborated. Error cannot be shown in the findings by pointing out that the discredited petitions may have contained the genuine signatures of some persons who, by signing, voiced an honest protest against the referred act and whose names were not counted for the petition. No doubt some good-faith signatures were on the rejected petitions; but even so, in view of the record before us, error cannot be predicated on their rejection, because the burden of proof was on the interveners to establish that fact, if it was a fact, when the probative value of the certificates of the three circulators was destroyed. This the interveners did not even attempt to prove. It need scarcely be said that as to the interveners and the secretary of state no blame can possibly attach in the premises, nor was any charged.

We believe the rule is well stated in *State v. Olcott*, 62 Or. 277, in a similar case: "As the circulator of a petition is the agent of the signer, and his oath is the only evidence of the genuineness of the signature, it

follows as a matter of course that, where he is shown to have acted fraudulently, the value of his verification is destroyed, and the petition must fall, unless the genuine signatures are affirmatively shown. But, in the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, it would be an unjust rule to deprive the honest signer of his right to have his signature counted, merely because some disqualified person signed, or because some person, without the knowledge of the circulator, affixed a fictitious name, or gave a fictitious address.''

Interveners again contend that under the Constitution it is mandatory that a referred act must be voted on at the next regular state election held not less than 30 days after the filing of the referendum petition or it never can be voted on. This question was decided adversely to their contention in the former appeal of this case. Although the court was not unanimous, the former decision is, of course, decisive of that point in the present case.

In this as in the former hearing, we are indebted to counsel for both parties for briefs of marked ability and oral argument of a high order.

We believe that our conclusion conforms to the intent of the legislature as expressed by the act in question. Finding no reversible error, the judgment of the district court is

AFFIRMED.