STURDY *v.* HALL, SECRETARY OF STATE.

4-6196 143 S. W. 2d 547

Opinion delivered October 14, 1940.

*Charles W. Mehaffy* and *Ed I. McKinley,* for plaintiff.

*J. S. Abercrombie, Edward H. Coulter* and *Tom F. Digby,* for defendants.

SMITH, J. On and prior to July 6, 1940, there was filed with the Secretary of State numerous petitions, which, together, contained the names of 13,807 signers. The petitions were in support of proposed Initiated Act No. 2, which the sponsors of the proposal refer to as the "Local Option Act".

The Secretary of State found and declared that the ballot title proposed for the Act was sufficient, and that 11,232 signatures were requisite and sufficient for the initiation of the proposed Act, and that the required number of electors had signed the petitions to entitle said Act No. 2 to be placed on the ballot to be voted upon at the general election to be held November 5, 1940.

Immediately after this ruling, the plaintiff here, who alleges he is a resident and elector of this State, had a check made of the signatures appearing on the petitions, and on September 10th he filed a complaint in this court, challenging the sufficiency of the petitions. In the complaint, the signatures challenged are arranged by counties, and there appears the name of each person whose signature is challenged and the ground of the challenge. At the time of the filing of this complaint here a copy thereof was delivered to the Attorney General, and another copy to the attorney for the Anti-Saloon League, which organization had sponsored the petitions. Without filing any response to the petition here, the Anti-Saloon League has been treated as an intervener, and its attorney was present at the tak-

ing of the voluminous testimony which we have in the record before us.

In the abstract of the testimony and the brief thereon for the plaintiff here, this testimony has been tabulated so that we have tables showing the grounds upon which the signatures have been questioned, and the number of signatures questioned in each county. The task would be interminable, and its performance of but little value, if we should review in detail the testimony abstracted in plaintiff's brief. We must be content to summarize and announce our conclusions upon it.

It is first insisted that the petitions bear the names of 2,998 persons who had failed to pay their poll tax. This number is arrived at by introducing copies of the published lists of persons who had paid poll tax (as required by § 4696, Pope's Digest, as amended by Act 82 of the Acts of 1939), and checking the names of the signers against these lists, counting all names not found in the published lists.

This procedure was approved in the cases of *Taafe* v. *Sanderson,* 173 Ark. 970, 294 S. W. 74; *Hargis* v. *Hall,* 196 Ark. 878, 120 S. W. 2d 335; and *Purdy* v. *Glover,* 199 Ark. 63, 132 S. W. 2d 821. The last two of these cases held that, where it is shown that a person has signed as a resident of a particular county, and the name of this person does not appear upon the official list of voters of that county, published pursuant to statute above referred to, a *prima facie* showing has been made that such person was not a qualified elector. This showing is *prima facie* only, and not conclusive.

If the names of these persons who, *prima facie,* had not paid their poll tax were excluded, the petitions do not contain the requisite number of names.

It has been held, however, that for this published list of voters to be given this *prima facie* effect, the requirements of the statute authorizing its publication must be complied with, and that where this was not done the published list of voters may not be given this *prima facie* value as evidence. For instance. in *Brown*

v. *Nisler,* 179 Ark. 178, 15 S. W. 2d 314, a contest by one claiming to be the rightful nominee of his party for the contested office based his claim almost entirely on the printed list of voters. His contest was dismissed when it appeared that there had not been a substantial compliance with the statute in the publication of the list. See, also, *Cain* v. *McGregor,* 182 Ark. 633, 32 S. W. 2d 319; *Darmer* v. *White,* 182 Ark. 638, 32 S. W. 2d 625; *Tucker* v. *Meroney,* 182 Ark. 681, 32 S. W. 2d 631; *Connelley* v. *Vester,* 186 Ark. 393, 53 S. W. 2d 861.

In the case of some of the lists of official voters here offered in evidence as having been published pursuant to the statute, it appears that the lists were not authenticated by the affidavit of the collector in person, or were not properly certified by the county clerk, as required by the interpretation of the statute in the cases last above cited. It becomes necessary, therefore, to consider the validity of other signatures. Before approaching this question it is well to announce the rules which must be applied, and the necessity therefor will be better appreciated when we consider the purpose and effect of these rules.

The recent census gave this state a population of slightly less than two million, and the belief is general that our population would have been shown to be substantially more had the census been accurately taken. There was polled at the last preceding general election 140,391 votes for the candidates for governor. The constitution makes this number the basis for the calculation of the number of signers who are required to initiate a law, who may refer an Act passed by the General Assembly, or who may propose constitutional amendments. Eight per cent. of the number of persons voting for governor may initiate an Act. That number is now 11,232. This is slightly more than one-half of one per cent. of our population. Six per cent. of this number, which is slightly less than one-half of one per cent. may arrest legislation passed by the General Assembly without an emergency clause and may refer even that legislation to the people for their approval. Ten per

cent. of this number, which is less than one per cent. of our population, may propose constitutional amendments. There is no limitation upon the number of Acts which may be initiated. Nor is there any limitation upon the number of Acts passed by the General Assembly which may be referred. Nor is there any limitation upon the number of constitutional amendments which may be proposed. It appears, therefore, that a very small per cent. of our population may, at each general election, assemble the electorate into both a general assembly, and a constitutional convention. The law must, therefore, be, and is, that if a power so great may be exercised by a number so small, a substantial compliance with the provisions of the Constitution conferring these powers should be required.

As a practical matter, and in the very nature of the case, signers to these petitions must be obtained by persons who make it their business and duty to obtain them. The I. & R. Amendment provides that "No law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions." That compensation would be a matter of agreement between the contracting parties, and might, in some instances, although not in the present case, be based upon the number of signers obtained, and the law must be declared as it should be applied in any case. There would, therefore, be a constant temptation for the circulator of petitions to increase his compensation by loose practices in obtaining signatures. The Constitution contemplated this possibility, and attempted to guard against its consequences.

Under the subhead on verification of petitions, the I. & R. Amendment provides: "Only legal voters shall be counted upon petitions. Petitions may be circulated and presented in parts, but each part of any petition shall have attached thereto the affidavit of the person circulating the same that all signatures thereon were made in the presence of the affiant, and that, to the best of the affiant's knowledge and belief, each signature is genuine, and that the person signing is a legal voter, and

no other affidavit or verification shall be required to establish the genuineness of such signatures".

This provision, as to the effect to be given the affidavit of the circulator, has been several times interpreted to mean that the circulator's affidavit is given *prima facie* verity. But this presumption is not conclusive. It would be intolerable if this were true. All of the cases of our own and from all other courts, construing similar provisions found in various I. & R. Amendments are to that effect.

It was held in the case of *Hargis* v. *Hall, supra,* that § 13289, Pope's Digest, passed as an enabling act to the first I. & R. Amendment, had not been repealed by the adoption of our present I. & R. Amendment, and that its provisions, as well as those of our present I. & R. Amendment, to which further reference will be made, must be substantially complied with.

The circulator of a petition is of the nature of an election official. The elector directs, by signing the petition, that the proposed Act shall be submitted to the people, and he must sign his own name, as held in *Hargis* v. *Hall, supra,* and he must do so in the presence of the circulator of the petition, in order that the circulator may truthfully make the affidavit required by both the Constitution and the statute. In many instances no one is present except the circulator of the petition and the signer, and when the circulator makes the required affidavit, the *prima facie* showing has been made that the elector signed the petition.

It is shown—and not questioned—that 92 persons signed more than one petition. No one will contend that any elector has the right to sign more than one petition. This was, no doubt, in many—if not in all—of the cases a mere inadvertence, without intent to commit a fraud, but, in legal effect, it was a fraud; but such duplication, even though intentionally and fraudulently done, would operate only to avoid the duplicate signatures.

This is an application of a principle frequently applied in contests over elections for office, or for nomi-

nations for an office. The fraud of the elector avoids only his own vote. A different rule prevails, however, where it is shown that frauds were committed by the persons holding the election.

In his work on American Law of Elections (4th Ed.), § 574, the rule is stated by Judge McCrary as follows: "There is a difference between a fraud committed by officers or with their knowledge and connivance, and a fraud committed by other persons, in this: the former is ordinarily fatal to the return, while the latter is not fatal, unless it appear that it has changed or rendered doubtful the result. If an officer of the election is detected in a wilful and deliberate fraud upon the ballot-box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not of itself sufficient to affect the result. The reason of this rule is that an officer who betrays his trust in one instance is shown to be capable of the infamy of defrauding the electors, and his certificate is, therefore, good for nothing."

This principle has been applied by this court in the following cases: *Freeman* v. *Lazarus,* 61 Ark. 247, 32 S. W. 680; *Schuman* v. *Sanderson,* 73 Ark. 187, 83 S. W. 940; *Rhodes* v. *Driver,* 69 Ark. 501, 64 S. W. 272; *Williams* v. *Buchanan,* 86 Ark. 259, 110 S. W. 1024; *Sailor* v. *Rankin,* 125 Ark. 557, 189 S. W. 357; *Sims* v. *Holmes,* 191 Ark. 1033, 88 S. W. 2d 1012.

The circulator of the petitions is the sole election officer, in whose presence the citizen exercises his right to sign the petition. The circulator must make affidavit that each signature is genuine, and if this affidavit is shown to be false, the petition loses its *prima facie* verity.

A name-by-name check of the petitions is shown by testimony not disputed, which discloses that there are 857 names on petitions which were not signed by the persons whose names appear on the petitions, but were put there by the circulator of said petitions. The undisputed testimony shows the names of 1,191 persons

whose names appear to have been written in the same handwriting by persons who had signed other names. It would appear, upon the authority of the case of *Hargis* v. *Hall*, *supra*, that these signatures must be excluded; but it further appears that upon the petitions containing these names a grand total of 7,378 names appear. All these names must be excluded for the reason that they appear upon petitions verified by the false affidavit of the circulator. No one would contend that names should be counted which appear upon petitions containing no verifying affidavit. The cases which have considered the question, as will presently appear, are to the effect that petitions verified by an affidavit shown to be false are treated as petitions having no affidavit. In other words, the false affidavit is no affidavit.

Now, the Amendment itself requires the circulator to make affidavit that the signatures were made in his presence, and that he believes the signatures to be genuine. We have held in the case of *Hargis* v. *Hall*, *supra*, that no signature is genuine unless signed by the petitioner himself.

If, therefore, the circulator of a petition makes affidavit that the signatures are genuine which were not signed by the petitioner himself, he has made a false affidavit, and when it is shown that the affidavit attached to a particular petition is false, that petition loses the presumption of verity. As it appears that there are more than seven thousand signatures upon petitions which have false affidavits attached, those petitions may not be included in the count of signers.

Oregon is a pioneer state in Initiative and Referendum legislation, and several of our cases have said that our own Amendment was patterned after the Amendment of that state, and we have frequently looked to the decisions of the Supreme Court of Oregon in construing legislation of that state to assist us in the construction of our own.

In the case of *State, ex rel McNary, Dist. Atty.,* v. *Olcott, Secretary of State,* 62 Ore. 277, 125 Pac. 303, it

was held by the Supreme Court of Oregon (to quote a headnote in that case) that "Where referendum petitions contain evidence of forgeries, perpetrated either by the circulators, or with their connivance, the *prima facie* case in favor of the genuineness of the petitions is overcome; and the burden is on those upholding the validity of the petition to establish the genuineness of each signature."

The question now under consideration was considered by the Supreme Court of South Dakota in the case of *Morford* v. *Pyle, Secretary of State,* 53 S. Dak. 356, 220 N. W. 907. Numerous objections·were there made to the petitions under review, the seventh of which was, that on many of the petitions names had been placed thereon by some one other than the person named. The court said the consideration of this objection sufficed to dispose of the question of the sufficiency of the petitions, and considered no other objection, but this objection was thoroughly considered. After quoting the statute of that state upon the subject of the verification of the petitions, it was there said: "When a person circulates a referendum petition, it is his duty to see and personally know every person who signs it. Unless he does know them, and see them all sign, he cannot honestly say that he is acquainted with each signer, and that each of them signed it personally, and that each of them added to his signature his place of residence, his business, his post office address, and the date of signing; that each and all of the signers were residents and electors of his particular county, and that each signer had full knowledge of the contents of the petition when he signed it; and when a person, not knowing these facts, makes the affidavit above set out, such affidavit is false, and must be knowingly false, and all the names on such petition must be rejected. *Barkley, et al.* v. *Pool,* 103 Neb. 629, 173 N. W. 600; *State, ex rel.* v. *Olcott,* 62 Ore. 277, 125 Pac. 303. To permit the petitions under discussion in this case to be counted would be to recede from the standard set by this court in *O'Brien* v. *Pyle, supra.*" (51 S. Dak. 385, 214 N. W. 623.)

The question was considered by the Supreme Court of Ohio in the case of *State, ex rel. Gongwer* v. *Graves, Secretary of State*, 90 Ohio St. 311, 107 N. E. 1018, in which case circulators of petitions were shown to have intentionally made false affidavits to the petitions, under which circumstance it was held that there would have been no abuse of discretion on the part of the Secretary of State to have rejected all parts of the petition sworn to by such circulators.

Here, there is no explanation, or attempt to explain, by the circulators who have made false affidavits that signatures were genuine, and, certainly, it must be presumed, at least in the absence of any explanation to the contrary, that a person who made an affidavit that certain statements were true did so intentionally.

There is intended no intimation that any of the affiants committed forgery. A number of the affidavits are not questioned, and are, no doubt, true. But others aver facts which the testimony shows is not true. These affiants may and, no doubt, did believe that the signatures were lawfully obtained; but their misconception of the law does not change the law; and where it was averred that the signatures had been lawfully obtained, when the law had not been complied with, the affidavits were necessarily false. No attempt was made to show nor was time asked in which to show that there were valid signatures on the petitions to which the false affidavits were attached.

For the reasons stated, the petitions containing the names of over seven thousand signers must be excluded, and if this is done, the petitions do not contain the number of names required to initiate the Act.

It follows, therefore, that the injunction prayed against the Secretary of State must be granted, and it is so ordered.

GRIFFIN SMITH, C. J., HUMPHREYS, J., dissent.

GRIFFIN SMITH, C. J., (dissenting). The decision invalidates three classes by enumeration and by an all-

inclusive omnibus finding creates a fourth class. Expressed in the language of the opinion they are:

(1) "Ninety-two persons who signed more than one petition."

(2) "There are 857 names on petitions which contain names which were not signed by the persons whose names appear on the petitions, but were put there by the circulators of said petitions."

(3) "The undisputed testimony shows the names of 1,191 persons whose names appear to have been written in the same handwriting by persons who had signed other names."

(4) "It further appears that upon the petitions containing these names a grand total of 7,378 names appear. All these names must be excluded because they appear upon petitions verified by the false affidavit of the circulator."

Total of all names on petitions filed with the secretary of state is 13,807. The number of valid signatures necessary to initiate the measure is 11,232. The first three classes contain 2,140 names, or 435 less than the 2,575 needed to invalidate the petition. Because petitions scattered throughout the record carry 2,140 invalid and "apparently" invalid signatures, 5,238 persons whose right to vote has not been challenged are eliminated because, as the majority opinion says, "petitions verified by an affidavit shown to be false are treated as petitions having no affidavit."

Finally, the opinion makes this concession: "There is intended no intimation that any of the affiants committed forgery. A number of the affidavits are not questioned and are no doubt true. But others aver facts which the testimony shows is not true. These affiants may and no doubt did believe that the signatures were lawfully obtained, but their misconception of the law does not change the law."

Neither those representing the liquor interests nor agents of the Anti-Saloon League are *the* interested parties in this litigation. When the petition was filed

it became a matter of public concern whether the electors would or would not have a right to vote upon the measure.

The petition was deposited with the Secretary of State July 6. Not until September 10—a period of sixty-six days—was there suggestion that an attack would be made. Those who challenge sufficiency spent weeks preparing their case. Under Amendment No. 7 we try all I. & R. questions when a proposed measure is challenged. In other words, this court has original jurisdiction. The instant controversy, on request of plaintiff, was advanced September 30. At that time counsel for defendants stated in open court that it would be difficult to meet the issues in the time allotted. It was also stated that if the nature of the evidence was not changed no testimony would be taken.

Because measures to be voted upon at the November election must be certified not later than October 18, it was contended that additional time for development of the instant controversy could not be allowed. Amendment No. 7 to the Constitution provides: "If the sufficiency of any petition is challenged such cause shall be a preferred cause and shall be tried at once, but the failure of the courts to decide prior to the election as to the sufficiency of any petition, shall not prevent the question from being placed upon the ballot at the election named in such petition, nor militate against the validity of such measure, if it shall have been approved by a vote of the people."

There is nothing in this language requiring a court decision prior to certification of the ballot. Regardless of such certification, a decision rendered before November 5th holding that the measure was improperly initiated would have the effect of nullifying it.

In view of the fact that it was not essential that the cause be heard on its merits and submitted October 7, I think those defending validity of the petition should have been accorded a reasonable time within which to meet the attacks.

Heretofore, in construing the initiative and referendum amendment, we have been influenced by deci-

sions of the Supreme Court of Oregon. In *State ex rel. McNary, District Attorney* v. *Olcott, Secretary of State*, 62 Ore. 277, 125 Pac. 303, it was held that where referendum petitions contained evidence of forgeries, perpetrated either by the circulator or with their connivance, the *prima facie* case in favor of the genuineness of the petition was overcome, and the burden shifted to those upholding validity to establish the genuineness of each signature.

In Ohio the fraud must have been intentional.

The majority opinion in the instant case rejects these holdings and turns to South Dakota for support. I have not overlooked language in the opinion wherein the words "*prima facie*" appear. For instance, there is this paragraph:

"If, therefore, the circulator of a petition makes affidavit that the signatures are genuine which were not signed by the petitioner himself, he has made a false affidavit, and when it is shown that the affidavit attached to a particular petition is false, that petition loses the presumption of verity. As it appears that there are more than seven thousand signatures upon petitions which have false affidavits attached, those petitions may not be included in the count of signers."

On first impression it would seem that the holding is that the petition counterparts upon which duplicate handwritings appear are not conclusively presumed to be fraudulent, for use is made of the term "presumption of verity." In another paragraph it is said: "The circulator must make affidavit that each signature is genuine, and if this affidavit is shown to be false, the petition loses its *prima facie* verity."

But what *is* an affidavit?

The opinion answers the question when it says: "No one would contend that names should be counted which appear upon petitions containing no verifying affidavit. The cases which have considered the question, as will presently appear, are to the effect that petitions verified by an affidavit shown to be false are treated as petitions

having no affidavit." Then there is this significant comment: "In other words, the false affidavit is no affidavit at all."

We must assume, therefore, that the opinion means what it says—that "a false affidavit is no affidavit at all."

Would it be contended that petition counterparts to which no affidavits were attached might be the subjects of artificial respiration for revivifying purposes and that, after time for filing the petition had expired, it was permissible for such circulator to show that he intended to make the required affidavit, but neglected to do so? But even if this contention should be sustained, we are dealing with a situation more aggravating in that the court holds "at least" a *prima facie* showing of a fraud has been made when there is evidence a name was signed by some one other than the elector. Neither the Oregon nor the Ohio court holds that a mere inadvertence upon the part of the circulator creates a presumption of fraud. The Olcott case from Oregon speaks of forgeries "perpetrated either by the circulators or with their connivance." In Ohio there must have been a purpose to falsify.

It seems that what has been held in the majority opinion amounts to a declaration that a false affidavit is no affidavit at all; that ascertainment of the fact that a name on a petition was not placed there by the elector in question shows fraudulent conduct, and "at least *prima facie*" deprives the petition of its verity. An express declaration that evidence would be admissible to overcome the presumption of fraud upon the part of the circulator is withheld.

If it be said that defendants did not undertake to establish verity of the names excluded, the answer is that within the time allowed by this court it would have been impossible to do so. Hence, we have adopted a harsh rule in submitting the cause in the face of a showing of facts which render an intelligible determination impossible. Reasonable time should have been allowed in which to establish authenticity of the names included

in the fourth classification when the burden shifted to the defendant.

In a number of instances it is indicated by chirography that the husband signed for his wife, or that the wife signed for her husband—as "John W. Brown," followed by "Mrs. John W. Brown." In the Hargis case it was held that one person could not sign for another. I do not wish in any degree to impair that determination or to recede from it. In the instant case the excluded names are not confined to cases covered by the illustration. The rule of exclusion is applied to all other names on the petition counterpart, including those who personally signed and who were in all respects qualified. The gravamen is that the party who secured the names (not knowing a man could not sign for his wife, or a wife for a husband) certified the signatures as genuine. I do not insist here that as to the Browns either name is valid. What I do object to is the holding that a false affidavit (though innocently made) is no affidavit at all, and that seven thousand electors are to be denied the right to vote on the issue—this through invocation of a rule new in this jurisdiction which has the effect of making the presumption of fraud conclusive. By this construction the circulator of a petition who innocently commits an error is placed in the category with election officers who deliberately prostitute the ballot.

Much might be said concerning poll tax lists filed as exhibits to the depositions of plaintiff's witnesses. In certain instances the printed lists are not certified by the collector or the county clerk. In other instances the clerk alone certified, while in still other instances certificate of the collector shows that time for paying poll taxes had expired when the list was verified. Therefore, it could not have contained late payers. There are certificates which do not show whether payments were made within the time prescribed by law, or for what year assessments were made.

It is my view that the certificates should include a recitation of facts essential to qualification. Some of the certificates are perfect examples of accuracy. But, since the majority opinion is not predicated upon illegal

poll tax payments, it is unnecessary to extend a discussion of these alleged irregularities. If given time it is probable plaintiff would have been able to authenticate many of the exhibits, thus passing the burden to defendants.

My dissent goes to action of the court in holding that an irregular affidavit was no affidavit and in following this statement with the declaration that a fraudulent affidavit loses its presumption of verity. I readily agree with the last conclusion, but not with the former as applied to the circumstances of the instant case.

My dissent also goes to the action of the court in not directing that the cause be fully developed.

Mr. Justice HUMPHREYS concurs in this dissenting opinion.