(No. 41264.—)

*In re* Petition for Removal of Frank Bower *et al.,* Appellants.—(James D. Welker, *et al.,* Appellees.)

*Opinion filed November 22, 1968.*

Paul A. Croegaert, Corporation Counsel, of Olney, for appellants.

Smith, McCollum & Riggle, of Flora, (Fred McCollum and James B. Moses, of counsel,) for appellees.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

We have granted leave to appeal the judgment of the Fifth District Appellate Court (91 Ill. App. 2d 63) which affirmed the decree of the circuit court of Richland County upholding the sufficiency of five petitions for recall of the mayor and four commissioners of Olney, Illinois. The appellate court opinion contains the following accurate factual account:

"Section 4—7—1, Chapter 24, Illinois Revised Statutes, 1965, relating to the removal of officers in commission form municipalities provides:

'Every incumbent of an elective office, under this article, except a judicial officer and an officer of a court, whether elected by a popular vote or appointed to fill a vacancy, is subject to removal at any time by the electors qualified to vote for members of the council. The procedure to effect the removal of an incumbent of such an office shall be as prescribed in sections 4—7—1 through 4—7—5.'

The initial procedure to effect this removal is provided in section 4—7—2 of the statute and requires the filing, with the municipal clerk, of a petition signed by electors amounting to at least 45% of the number of votes cast for Mayor at the last preceding general quadrennial municipal election. This subsection of the statute also provides that the petition 'shall contain a general statement, of not more than 200 words, of the reasons for which the removal is sought.'

"Separate petitions were filed in the office of Kathryn Flanders, City Clerk, on September 14, 1966, demanding an election on the question of removal from office of Mayor Frank Bower and Commissioners Jerry D. Black, Bernard Edwards, Forrest Bunting and John Ginder. No charges of malfeasance or misfeasance in office were made and the reasons for seeking the election were identical on each petition and are as follows:

'1. Refusal to permit electors of Olney to vote on an ordinance for the issue of waterworks revenue bonds and the proposed lake and other construction mentioned in the ordinance. (Ordinances 66—21 and 66—26), in spite of repeated petitions by the electors.

'2. Willingness to impose on the people who use water and sewer in Olney high rates which are unnecessary and which impose hardship on residents with low and fixed incomes.

'3. Willingness to disregard expressed wishes of more than 1,500 persons to save Bird Haven in its natural state.

'4. Efforts to relocate the city dump to land near the west edge of Olney directly north of Route 250 where it will be a nuisance to residents in the western part of Olney and a pollution hazard to Fox Creek.'

"Within the five days allowed by Chapter 24, Section 4—7—4 of the statute, identical objections were filed attacking the validity of the petitions and the petitions and objections thereto were consolidated for hearing in the Circuit Court of Richland County and for purposes of this appeal. It was stipulated that for the purpose of the hearing, the evidence presented as to the petition regarding Mayor Frank Bower and the court's ruling thereon would be the same on the remaining four petitions if the same issues were raised and evidence presented thereon. It was further stipulated that the number of signatures required on each of the petitions was 1,458.

"The original petition against Mayor Frank Bower consisted of 115 sheets containing thereon 1,710 signatures. The original petition against Commissioner Jerry D. Black consisted of 117 pages containing thereon 1,723 signatures. The original petition against Commissioner Bernard Edwards consisted of 115 pages containing thereon 1,708 signatures. The original petition against Commissioner Forrest Bunting consisted of 115 pages containing thereon

1,679 signatures. The original petition against Commissioner John Ginder consisted of 116 pages containing thereon 1,744 signatures." 91 Ill. App. 2d at 65, 66.

Since the appellate court opinion was rendered, the election requested in the recall petitions has been held as to Commissioners Forrest Bunting and Bernard Edwards and they have been retained in office. They are not parties to this appeal.

The first contention raised by appellants is that the general statements set forth in the petitions were insufficient as a matter of law to require a recall election because they did not charge acts constituting malfeasance, misfeasance or nonfeasance. Appellants advance the theory that cause for recall must relate to official incompetency or misconduct in office, and be more than mere disagreement with policy decisions made by officeholders. Cases from three jurisdictions (*State ex rel. Peterkin* v. *City Council,* 95 W. Va. 502, 121 S.E. 489; *People ex rel. Elliott* v. *O'Hara,* 246 Mich. 312, 224 N.W. 384; *Newberg* v. *Donnelly,* 235 Mich. 531, 209 N.W. 572; *Joyner* v. *Shuman* (Fla. App.), 116 So. 2d 472) are cited by appellants in support of their position, although appellants' counsel fails to note that the cited Michigan cases were expressly overruled in *Wallace* v. *Tripp,* 358 Mich. 668, 101 N.W.2d 312, 315, where the cases he relies upon are classified as abberational. The remaining cases cited represent a minority view which we reject because we find a legislative intent embodied in our statutes that officeholders in the commission form of local government should be subject to recall by the voters for reasons which are purely political in nature. This philosophy was adopted in *Westpy* v. *Burnett,* 82 N.J. Super. 239, 197 A. 2d 400, 404, where it is noted: "The courts throughout the United States have generally adopted the view that the power granted to electors of a municipality to remove certain public officers through recall procedure is political in nature and that it is for the people, and not the

courts, to decide the truth and sufficiency of the grounds asserted for removal. In most states statutory and charter provisions as to recall are liberally interpreted in favor of the electorate. This liberality is also extended to the usually required statement or general statement 'of the grounds upon which the removal is sought.' " See *Batchelor* v. *Eighth Judicial District Court,* 81 Nev. 629, 408 P.2d 239; *Wallace* v. *Tripp; State ex rel. Topping* v. *Houston,* 94 Neb. 445, 143 N.W. 796; *Dunham* v. *Ardery,* 43 Okla. 619, 143 Pac. 331; *Laam* v. *McLaren,* 28 Cal. App. 632, 153 Pac. 985.

We are in accord with the construction that the appellate court below has given the provisions of the Municipal Code relating to recall, *i.e.,* since section 4—7—9 provides that no removal petition shall be filed against any officer until he has actually held office for at least twelve months and since the number of electors signing the petition must equal at least 45% of the number of votes cast at the last general election for mayor (Ill. Rev. Stat. 1967, chap. 24, par. 4—7—2), the legislative intendment is clear that such recall elections may be held in order to remove from office local elected officials because of the voters' displeasure with the policies pursued by those officials regardless of the lack of nonfeasance, misfeasance or malfeasance on the part of such officials. The only logical reason which we can ascribe for requiring the electors to wait one year before petitioning for a recall election is to prevent premature action on their part in voting to remove a newly elected official before having had sufficient time to evaluate the soundness of his political policies and decisions. We view the statutory provision requiring the number of petition signers to equal at least 45% of the total votes cast in the last general election for mayor as a further attempt to insure that an official will not have to defend his policies against frivolous attacks launched by a small percentage of disenchanted electors. The power of the electorate to initiate recall pro-

cedures after one year, however, does not in any way diminish the right of the public to seek removal of an elected official before one year when such an officer is guilty of official misconduct which constitutes "cause" for removal. See *Joyce* v. *Board of Education,* 325 Ill. App. 543, *cert.* denied 327 U.S. 786, 90 L. Ed. 1013; 66 S. Ct. 702; *Hayes* v. *Civil Service Com.,* 348 Ill. App. 146.

The principle underlying the recall of public officers has been defined as an effective and speedy remedy to remove an official who is not giving satisfaction to the public and whom the electors do not want to remain in office, regardless of whether or not he is discharging his full duty to the best of his ability and as his conscience dictates. (*Dunham* v. *Ardery,* 43 Okla. 619, 143 Pac. 331.) The instant appeal is but the second case to reach appellate courts of this State involving a recall proceeding brought under the relevant provisions of the Municipal Code (see *In re Rice,* 35 Ill. App. 2d 79), and as to the wisdom of the adoption of this procedure we are in agreement with the view of the Nebraska Supreme Court that "The policy of the recall may be wise or it may be vicious in its results. We express no opinion as to its wisdom with respect to the removal of administrative officers. If the people of the state find after a trial of the experiment that the provisions of the statute lead to capable officials being vexed with petitions for their recall, based upon mere insinuations or upon frivolous grounds, or because they are performing their duty and enforcing the law, as they are bound to do by their oath of office, or lead without good and sufficient reason to frequent costly and unnecessary elections, they have the power through their Legislature to amend the statute so as to protect honest and courageous officials." *State ex rel. Topping* v. *Houston,* 94 Neb. 445, 143 N.W. 796, 800.

The appellants' second contention is that since fraud was shown on the part of some of the circulators of the recall petitions, the *prima facie* case made by the circulators'

affidavits was overcome, and the burden of proving the validity of each signature shifted to the petitioners in order to sustain the petitions. The "proof" of fraud which the appellants offered in the trial court was elicited by calling only 2 of the 43 petition circulators, although all of the circulators had been subpoenaed into court. The 2 circulators who testified, Maurice Stafford and Barbara Keen, had circulated a total of 16 different sheets containing 247 signatures that were called into question by the appellants. Stafford had circulated 12 of the sheets which contained 194 signatures and Keen had circulated 4 of the sheets which contained 53 signatures. The trial court ruled that 23 of the 247 signatures obtained by witnesses Stafford and Keen were improper and they were stricken. Of the 23 disallowed signatures 11 were struck because they appeared to be in the same handwriting as the signature of a relative, the trial court ruling that if any two signatures were in the same handwriting one must be stricken. Eight signatures were struck because the proof established a husband or wife had signed the name of a spouse who was not present; three others were struck because they were duplicates of signatures appearing on other pages of the petition, and one signature was struck because it was illegible. Early during the submission of evidence by the appellants they moved that all of the signatures be stricken because of a showing of "fraud" in regard to some of the signatures. The court ruled that unless and until the signatures on the petitions were shown to have been procured by the circulators with knowledge of their impropriety and with an intent to deceive or corruptly take the signatures, the petitions would not be stricken in their entirety but only as to the improper signatures contained therein. The court repeatedly adhered to this ruling even after one of the petition signers, Nancy Tarpley, testified that she had been contacted by circulator Keen and asked to sign both her name and Mr. Tarpley's name although he was at work. Mrs. Tarpley

stated that Keen told her to try to write her husband's name differently from her own signature. Circulator Keen denied ever requesting Mrs. Tarpley to sign her husband's name on the petitions or instructing her to make that signature look different from her own.

Since the trial judge continued to deny appellants' motions to strike all of the signatures on the recall petitions, it is clear that he failed to find a sufficient showing of deliberate fraud on the part of the circulators to shift the burden of proof from the objectors to show the invalidity of the signatures to the proponents of the petitions to show the genuineness of the signatures. We agree on the state of the evidence presented that the proof of improper signatures was inadequate to rebut the *prima facie* validity made by the affidavits of the circulators in favor of the genuineness of the petitions. Appellants cite the case of *Sturdy* v. *Hall*, 201 Ark. 38, 143 S.W.2d 547, where it is stated that if "the circulator of a petition makes affidavit that the signatures are genuine which were not signed by the petitioner himself, he has made a false affidavit and when it is shown that the affidavit attached to a particular petition is false, that petition loses the presumption of verity." (143 S.W.2d at 551.) However, in that case, of the 7,378 signatures appearing on the petitions there involved, 857 of the names were proved by undisputed testimony to have been signed by the circulator of the petitions and another 1191 names appeared to have been written by persons who had signed other names. There was no such wholesale fraud established in the case at bar. At most, the proof here showed that a comparatively few husbands or wives had signed for their spouses; there was no convincing evidence that this was generally done at the instigation of the circulators; in fact in only one instance is there testimony that a circulator suggested this, and that testimony is contradicted by the circulator involved. The state of mind with which the circulators viewed this practice may have been represented by

Stafford when he stated, "I really didn't think so long as the wife signed for the husband or the husband signed for the wife there wasn't [*sic*] too much wrong with it since they were husband and wife." However, while such spouse-signing is clearly improper and would shift the burden of proof or invalidate the petitions if established in sufficient volume, the failure of circulators to object thereto is not the type of active and corrupt fraud which should, in the absence of such proof, serve to destroy the validating effect of the circulator's affidavit. No effort was made to establish that any other circulator shared this view, and the trial judge allowed only one signature to stand wherever it appeared that more than one was in the same handwriting. In these circumstances we find the later Arkansas Supreme Court decision of *Pafford* v. *Hall,* 217 Ark. 734, 233 S.W.2d 72, to be much closer to the point than the earlier *Sturdy* case cited to us by appellants. In *Pafford* it was shown that in at least one instance on each of 1,290 out of 1,700 separate sheets of an initiative petition there was a signature of a husband who had signed his wife's name in addition to his own or *vice versa.* The court there held that "one who attacks a petition cannot destroy the verity of the circulator's affidavit merely by proving that at least one signature [per page] is not genuine." 233 S.W.2d at 74.

We accordingly hold that in the absence of proof by a fair preponderance of the evidence that a circulator has acted fraudulently in obtaining false signatures, only those signatures proved to be unauthentic by the objectors should be stricken. (See *Kaesser* v. *Becker,* 295 Mo. 93, 243 S.W. 346, 350.) In *State ex rel. Jensen* v. *Wells,* 66 S.D. 236, 281 N.W. 99, it is said that in order to be considered fraudulent, an affidavit of verification attached to a petition for a referendum must not only be false but must also be made fraudulently as established by the evidence, that is, with the intent to deceive. (281 N.W. at 103.) In *In re Initiative Petition No. 272* (Okla.), 388 P.2d 290, 293, the

court noted: "If the circulator's affidavit is 'wilfully, corruptly and intentionally' false and is impeached for fraud in its execution, the probative value of such affidavit is destroyed and none of the signatures on the sheet will be counted unless affirmatively shown to be genuine. However, in order to invalidate all signatures upon a pamphlet, more proof is required than the presence of a single false signature or of some false signatures on the sheet. Protestants must go further and establish intentional fraud, wilful misconduct or guilty knowledge on the part of those who circulated the questioned pamphlets. The element of conscious and deliberate fraud must be present. Mere falsity of a single signature, or some signatures, on a pamphlet, does not of itself render the circulator's affidavit thereon fraudulent nor does it operate to taint such affidavit by guilty knowledge. The phrase 'guilty knowledge' is synonymous with the term scienter. It means culpable ignorance of the truth or conscious awareness of falsity. Fraud or guilty knowledge will not be imputed to the circulator, but must be affirmatively established. In re State Question No. 138, Initiative Petition No. 89, 114 Okl. 285, 244 P. 801, 804. In re Initiative Petition No. 224, 197 Okl. 432, 172 P.2d 324, 326; see also Sturdy v. Hall, 204 Ark. 785, 164 S.W. 2d 884, 887; Pafford v. Hull, 217 Ark. 734, 233 S.W.2d 72, 74." See also, *In re Initiative Petition No. 281* (Okla.), 434 P.2d 941; *In re Referendum Petition No. 71*, 179 Okla. 381, 65 P.2d 985.

We do not believe that such fraud was shown on the part of the two circulators who were called to testify as to justify striking the signatures procured by all 43 circulators; the trial court therefore acted correctly in refusing to strike all of the signatures on the recall petitions because of isolated instances of proof that certain signatures were improper, and the judgment of the appellate court upholding the decision of the trial court that the recall petitions were sufficient is affirmed.  *Judgment affirmed.*