HARGIS v. HALL, SECRETARY OF STATE.

4-5332                                                    120 S. W. 2d 335.

Opinion delivered October 17, 1938.

*Miles & Amsler,* for plaintiff.

*A. L. Rotenberry,* for defendant and interveners.

GRIFFIN SMITH, C. J. Prior to July 8, 1938, A. L. Rotenberry and others filed with the Secretary of State certain initiative petitions which purported to contain the names of 17,985 electors. They proposed to initiate an act to create a state pension department and to provide for its administration.

The text of the proposed act is voluminous. It was painstakingly prepared and printed in appropriate form, whereupon counterparts containing certain signatures were filed with the Secretary of State, at which time the proposed ballot title, copied below, was submitted:

"An act to provide pensions for indigent aged and blind citizens of Arkansas; for a pension department and an honorary pension commission and the manner of their selection; a pension commissioner and the manner of his selection and salary; county directors and honorary boards and the manner of their selection; limiting the administrative expenses to five per cent. of pension funds; providing revenues to pay the pensions by re-enacting present sales tax law and appropriating forty per cent. thereof for same, and the retention of the 33 1/3 per cent. of the present horse and greyhound racing taxes, $500,000 liquor tax, pool hall and slot-machine taxes and the grants from the Federal government; appropriating three million dollars for the fiscal year 1938-1939; providing penalties for violation of act, and for other purposes."

Proceedings were filed in this court wherein it was sought to have the ballot title declared insufficient. Such action was instituted before the Secretary of State had approved or disapproved the title. The suit was dismissed as premature. Thereafter, the Secretary of State held that the title was sufficient, and again the question was presented to this court. *Lewis* v. *Hall, Secretary of State, ante* p. 115, 116 S. W. 2d 353. Action of the Secretary of State was sustained, and the injunction was denied.

September 10, 1938, H. P. Hargis filed his complaint in an original action in this court, naming as defendants the Secretary of State, and the State Board of Election Commissioners.

It was alleged that fraud had been practiced in procurement of signatures to the petition; that several thousand of the names' tendered were not those of qualified voters; that other thousands had been forged, and that still other irregularities of a nature impairing the petition existed. Prayer of the complaint was "That the action of the Secretary of State in declaring the petition sufficient be held void; that all names appearing on said petition who are not legal voters be stricken therefrom; that all names which are forgeries be declared void; that the names on all parts of the petition which were not signed and properly certified thereto by the circulators thereof be stricken; that the names on all parts of the petition which are not properly notarized be stricken; that all names which appear more than once upon the petition and which are duplications be stricken; that said petition be declared insufficient as to the number of signers; . . . that the State Board of Election Commissioners be restrained and enjoined from certifying said ballot title to the Secretary of State, and that the Secretary of State and the Board of Election Commissioners be restrained and enjoined from placing said act, or the ballot title thereof, upon the ticket which is to be voted upon in the general election November 8, 1938."

A. L. Rotenberry and others, as "sponsors, legal voters, taxpayers, and citizens, for themselves and all

other interested parties," were permitted to intervene. They filed a separate answer and general denial. They also pleaded that the plaintiff was barred from further prosecuting the cause "for the reason that any defense that the plaintiff or any other interested party might raise could have been raised and adjudicated in the case of *Lewis* v. *Hall* [referred to, *supra*], and that all such issues have been duly adjudicated, or could have been adjudicated in that case. Interveners further allege that if the plaintiff had any cause of action it should have been first brought before the Secretary of State and decided by him in the first instance, and that whatever cause of action the plaintiff might have had is prematurely brought in this court."

At an adjourned session held September 20 for the purpose of disposing of preliminary questions, we held that original jurisdiction to determine the sufficiency of state-wide petitions was conferred upon the Supreme Court by Amendment No. 7; that official action of the Secretary of State in holding that the petition was sufficient was subject to review in the manner prayed for by plaintiff, and that in the Lewis-Hall case there was an express finding that the petition and response "presented the sole issue of whether the ballot title . . . was sufficient." The plea of *res judicata* was denied. It was directed that the cause be heard on depositions and oral argument, and that briefs be submitted.

Amendment No. 7 to the Constitution, known as the Initiative and Referendum Amendment, authorizes eight per cent. of the voters to propose any law. There are these provisions: "Only legal voters shall be counted upon petitions. Petitions may be circulated and presented in parts, but each part of any petition shall have attached thereto the affidavit of the person circulating the same, that all signatures thereon were made in the presence of the affiant, and that to the best of the affiant's knowledge and belief each signature is genuine, and that the person signing is a legal voter. . . . No law shall be passed . . . interfering with the freedom of the people in procuring petitions; but laws shall

be enacted prohibiting and penalizing perjury, forgery, and all other felonies or. other fraudulent practices, in the securing of signatures or filing of petitions. . . . That this amendment to the constitution of the state be, and the same shall be in substitution of the initiative and referendum amendment approved February 19, 1909,. . . . and that the said amendment (and the act of the General Assembly to carry out the same, approved June 30, 1911, so far as the same is in conflict herewith), be and the same are hereby repealed.''

Depositions filed by the plaintiff present evidence which, if true, renders the initiative petition insufficient.

Louise Dennis testified that she had examined the 544 separate sheets or parts of the petition. Attached an an exhibit to her testimony was the official list of electors of Pulaski county, showing the names of those who paid their poll taxes prior to June 15, 1937. By comparing such list with the petition, she found that 931 of those who purportedly signed the petition were not listed in the certified publication.

With respect to other counties checked by the witness in similar manner, the following discrepancies were testified to: Names appearing on petition counterparts from various counties, and not appearing in the official poll tax books, were: Benton county, 72; Clay, 35; Little River, 104; Saline, 167; Ouachita, 63; Greene, 107; Hempstead, 55; Franklin, 118; Phillips, 10; Logan, 253; Mississippi, 528; Lincoln, 23; Lawrence, 126; Polk, 361; Sebastian, 218; Jackson, 14; Ashley, 15; Clark, 76; Craighead, 377; Crawford, 203—a total of 4,250 as to which the evidence is undisputed that such signers were not included in the official poll lists.

The witness also identified a list of 2,003 names taken from sheets 1 to 159 of the Pulaski county petition, copied on 26 typewritten pages, and filed as exhibit ''56'' to her testimony. Other similar lists were brought into the record as exhibits ''57'' to ''72,'' inclusive. These contained names taken from counterparts circulated in Arkansas, Lincoln, Ouachita, St. Francis, Little River, Phillips, Lafayette, Jackson, Crit-

tenden, Sharp, Greene, Izard, Lee, and Perry counties. There were 4,280 names on these lists.

Exhibit "73" is a list of the names of persons who appear more than once on the petition.

The witness testified that she made a list showing that affidavits by those who circulated petition parts had been taken before G. G. Fulmer in Little Rock. Four of the sheets so attested were from Arkansas county, one from Crawford county, sixteen from Ouachita county, eight from Phillips county, one from Sebastian county, three from St. Francis county, and sixty-one from Pulaski county. Exclusive of names appearing on exhibits "56" to "72," Fulmer had taken the affidavits of petition circulators who presented a total of 4,983 names. Four sheets of the petition from Arkansas county appeared to have been attested by the same person who circulated it. Likewise, affidavits of the party who circulated the petition in Mississippi county, as to forty-eight names, was taken before the circulator.

Sixteen names were found on a plain sheet of paper attached to page one of the counterpart circulated in Jackson county, and fourteen names so appeared from Logan county.

A list containing 698 names of persons whose addresses were not given had been compiled.

In support of the allegation that thousands of names had been put on the petition by persons other than the purported voters whose names were being utilized, R. J. Rice, E. E. Beaumont, and others were called to testify.

Rice is vice-president and cashier of the Twin City Bank of North Little Rock. He has been in the banking business since 1912, has been bookkeeper, teller, etc., and has given special study to the characteristics of handwriting, and signatures. His name appears on sheet eleven of the counterpart petition circulated in Pulaski county. Witness did not sign the list, or authorize anyone to sign for him. He testified that he was familiar with the handwriting and signatures of many of the persons whose names appeared on the petition, and that in

his opinion the writing was not that of the persons represented.

The witness Beaumont had been in the banking business twenty-eight years, and is familiar with handwritings. It was his opinion that many of the names in question from various counties were in the same handwriting as to groups which included large numbers of the so-called petitioners.

William J. Kirby, Supreme Court librarian, testified that he lived at 200 Pearl street, Little Rock. When shown the petition whereon his name appeared, he stated that he did not sign it; that it was not presented to him; that he did not authorize any one to sign for him; and that he did not know C. J. Cook, whose acknowledgment appeared as circulator. Testimony of many others whose names appeared on the petition was to the same effect. Among these witnesses was A. G. Sadler, deputy to the Supreme Court clerk; M. R. Owens, high school supervisor in the State Department of Education; T. M. Stinnitt, director of teacher training, State Department of Education; H. G. Combs, prominent attorney of Little Rock—and so on, through a long list. There was testimony that some of the people whose names appeared on the petition had long since been dead, and that others had moved from the state. Other testimony related to errors in the spelling of names or in the initials of electors certified in the poll-tax books, it having been shown that the same errors were carried into the petition. Testimony as to the irregularities complained of was not confined to Little Rock, but included other counties.

The original petition deposited with the Secretary of State has been filed with this court, and we have examined it very carefully. Physical evidence is conclusive that circulators of counterparts secured names by a process other than procurement of original signatures.

On each sheet, or counterpart, there are ruled spaces for thirty-three names. Hundreds of names are signed in the same handwriting. There is not even an attempt to disguise the fact that in many, many instances such

names were written by the person who circulated the petition.

The affidavit of circulators, printed for acknowledgment at the bottom of each counterpart of the petition, is: "State of Arkansas, County of [blank]. I, [name of circulator] being first duly sworn, state: I circulated the above and foregoing petition, and that the foregoing persons signed this sheet of the foregoing petition, and each of them signed his or her name in my presence. I believe that each has stated his or her name, residence, post office and voting precinct correctly and that each person signing the same is a legal voter of the state of Arkansas." (Signed and attested.)

It is tacitly admitted in the brief of the interveners that original signatures were not procured as to the group lists to which plaintiff directs attention. "We contend," say the interveners, "that the law of the whole case governing the charge of fraud and forgeries in the petition is based solely upon the question of whether a legal voter may authorize some one else to sign his name to the petition." *Lipscomb et al. v. Blanz*, 163 Ark. 1, 258 S. W. 624, is cited as authority for the principle of law contended for by interveners. The question there involved validity of a signature to a petition to create an improvement district. Actual signature of the property-owner had been affixed by the daughter of such property-owner, on direction. In the opinion there appears a quotation from Mechem on Agency, vol. 2, § 208, page 152, which says:

"Where a person about to perform a certain act, himself determines upon all the elements of it which essentially belong to it, he may avail himself of any mechanical or ministerial agency which may be convenient in giving physical form or manifestation to the act. Human instrumentalities may be employed for this purpose as well as inanimate ones. If I wish to sign my name to a document I may use a pen, typewriter, rubber stamp, or the hand of a third person indifferently. Inasmuch as, in such case, I furnish the consciousness, the volition, the will, and cause the act to be done under my

immediate direction and control, it is my act whether I employ an inanimate tool to make the visible mark; or an animate one. Such a tool so used is not an agent, and the rules governing the appointment of agents do not apply to its use."

Interveners also direct attention to § 13289 of Pope's Digest appearing under the title, "Verification of Each Sheet." The emphasized sentence is: "Forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors." The quotation is a part of the statute passed in aid of the initiative and referendum amendment of 1909, and the interveners, by invoking its provisions in part, seem to have conceded that it has not been repealed. In this they are correct.

Amendment No. 7, by its express terms, repealed the prior amendment on the same subject, and it repealed . . . "the act of the General Assembly to carry out the same, approved June 30, 1911, *so far as the same is in conflict herewith.*"

The 1911 enactment in part provided: "Any person signing any name other than his own to such petition, or who shall knowingly sign his name more than once for the same measure at any one election, or who shall sign such petition when he is not a legal voter, . . . shall be guilty of a felony, and shall be imprisoned in the state penitentiary for not less than one year nor more than five years."

If these provisions are in conflict with Amendment No. 7, they were repealed. If they are not in conflict with the amendment, they are still the law, and the right to sign another's name to an initiative petition does not exist.

In *Townsend* v. *McDonald,* 184 Ark. 273, 42 S. W. 2d 410, certain provisions of the 1911 statute were considered. The opinion, written by Chief Justice HART in 1931, contains this statement: "It will be noted that [Amendment No. 7] provides that it shall be in substitution of the initiative and referendum amendment approved February 9, 1909, and that said amendment

and the act of the General Assembly to carry out the same approved June 30, 1911, so far as the same is in conflict herewith, be and the same are hereby repealed. This manifestly indicates the will of the people to leave in force the act of the General Assembly approved June 30, 1911, which was for the purpose of carrying out the original amendment, except in so far as it is repugnant to or in conflict with the present amendment. It also indicates a purpose on the part of the people to authorize the Legislature to adopt a procedure in harmony with the amendment to carry out its provisions. Otherwise the amendment itself would have declared that the act of the General Assembly referred to was repealed. . . . There is nothing in the section which is in conflict with or repugnant to the provisions of the constitutional amendment.''

Plaintiff's proof in the instant case is that approximately six thousand names were signed to the petition which were affixed by persons other than those whose names so appear.

The amendment contemplates that signatures must be genuine. That purpose is so expressed. By the amendment's terms laws may be enacted ''prohibiting and penalizing perjury, forgery, and all other felonies *or other fraudulent practices* in the securing of signatures or filing of petitions.'' The amendment repealed such parts of the act of 1911 as were in conflict with its purposes; but, as Judge HART has so clearly stated, the use of language in Amendment No. 7 entirely repealing the former amendment, but limiting repeal of the statute of 1911 to such portions as were in conflict with Amendment No. 7, is conclusive of the proposition that those who wrote the new amendment recognized certain values in the act of 1911, and that it was their purpose to utilize these values in administering the amendment.

We hold, therefore, that the statutory inhibition against a person signing any name other than his or her own to an initiative petition is not in conflict with or repugnant to Amendment No. 7, and it was not repealed. But even without such statute, we think the amendment,

by its own terms, contemplated that the genuine signature of electors be procured.

We hold, further, that the official poll tax lists, as certified by the collector and county clerk, contain, *prima facie,* the names of all persons who are eligible to vote. See *Taaffe* v. *Sanderson,* 173 Ark. 970, 294 S. W. 74, where it was said: "Section 3740 of C. & M. Digest makes certain requirements with reference to [the] official list of qualified electors of the county. . . . It bore the printed signature of the county clerk, certifying thereto, and that, if a voter's name did not appear thereon, he would be required to file with the judges other evidence of his qualifications, and such evidence would have to be returned by the judges, under the authority of cases heretofore cited."

No testimony has been offered even tending to show that the more than four thousand persons whose names appear on the petition, but did not appear on the official poll tax lists, were qualified electors, and the presumption attaches that they were not.

A total of 184,460 votes was cast for the office of governor at the general election in 1936. Eight per cent. of this number is 14,756. When illegal names on the petition before us have been eliminated, such petition falls far short of having the requisite number of signers, and becomes insufficient.

The relief prayed for by plaintiff is granted.