Bobby ROBERTS, *et al.*, Petitioners *v.* Sharon PRIEST, Secretary of State, Respondent *v.* John Hoyle, *et al.*, Intervenors

98-1052 975 S.W.2d 850

Supreme Court of Arkansas
Opinion delivered October 15, 1998

[Petition for rehearing denied October 22, 1998.]

504

*Friday, Eldredge & Clark,* by: *Elizabeth Robben Murray; Robert S. Shafer,* and *Ellen M. Owens,* for petitioner.

*Winston Bryant,* Att'y Gen., by: *Tim Humphries,* Senior Ass't Att'y Gen.; and *Ann Purvis,* Gen. Counsel, Sec. of State, for respondent.

*Oscar Stilley,* for intervenors.

W.H. "DUB" ARNOLD, Chief Justice. Arkansas Supreme Court Rules 6-5(a) and 1-2(a)(8) (1998) authorize us to exercise jurisdiction over this original-action petition, filed by Bobby Roberts, an Arkansas resident, taxpayer, and registered voter, individually, and on behalf of Arkansans to Protect Police, Libraries, Education & Services (APPLES). Specifically, the petitioner challenges the sufficiency of a statewide initiative petition, originated pursuant to Ark. Const. amend. 7, and the inclusion of proposed constitutional Amendment 4 on the November 3, 1998, general-election ballot. In support of removing the proposed measure from the ballot, the petitioner raises two arguments contesting (1) the validity of the signatures appearing on the initiative petition; and (2) the adequacy of disclosure of the proposed measure's ballot title. We find merit in petitioner's first point, grant the petition, and enjoin the Secretary of State from placing the proposed measure on the November 3, 1998, ballot. Alternatively, we direct that any votes cast on the proposed amendment not be counted or certified. Consequently, the petitioner's second point is moot, and we need not consider the merits of the ballot title.

On July 2, 1998, proposed constitutional Amendment 4 was filed with the respondent, Secretary of State. The popular name of the proposed measure reads:

> An Amendment To Abolish Ad Valorem Property Taxes; Authorize the Increase of Sales and Use Tax, Require Voter Approval of New Taxes and Tax Rates, Require Periodic Voter Approval for Certain Local Sales, Use, and Occupation Taxes, Limit State and Local Regulation, And For Other Purposes ("Amendment 4").

During the certification process, the Secretary of State determined that the measure's sponsor submitted 72,810 valid legal-voter signatures, representing a margin of 855 signatures over and above the minimum threshold requirement of 71,955 qualified signatures. Amendment 7 to the Arkansas Constitution defines the number of qualified signatures required to initiate a constitutional amendment as equal to ten percent of the votes cast in the gubernatorial race in the preceding general election, here, 71,955 signatures. Accordingly, on July 28, 1998, the respondent stated that Amendment 4 satisfied the signature requirements of Ark. Const. amend. 7 and certified the measure for inclusion on the November 3, 1998, ballot.

Subsequently, on August 26, 1998, the petitioner filed its complaint contesting the sufficiency of the certified signatures and the adequacy of the ballot title. Count I of the original action complaint alleges that in excess of 855 signatures on the initiative petition (i.e., the margin of sufficiency as determined by the Secretary of State), were forged or unlawfully obtained, or are found on petition parts that were illegally or improperly executed by the canvassers or purported canvassers, or were improperly notarized, in violation of constitutional and statutory requirements.

On September 11, 1998, John Hoyle, the initiative's sponsor, intervened in this action, individually and on behalf of Arkansas Taxpayers' Rights Association. In response to the complaint, the intervenors asserted that the petition was not deficient due to invalid signatures. Alternatively, they argued that even if some signatures were invalid, sufficient valid signatures remained to withstand the challenge. The intervenors also filed a counterclaim, seeking thirty additional days to submit proof that previously

rejected signatures were valid and to cure defects through continued solicitation of signatures. Finally, the intervenors raised general constitutional objections to the complaint, namely, that a decision adverse to the intervenors would violate their fundamental rights to petition the government for redress of grievances.

In response to the intervenors' counterclaim, the petitioner conceded that the intervenors should be permitted to submit proof that the Secretary of State should have counted previously rejected signatures but denied that the intervenors have suffered any unconstitutional denial of a right to petition the government for redress of grievances. In our *per curiam* opinion dated September 11, 1998, we addressed the applicability of the intervenors' request for a "thirty-day cure period," pursuant to Ark. Code Ann. § 7-9-111 (Repl. 1993). We held that the "thirty-day cure period" applies only in the case of an adverse action on the part of the Secretary of State and has no application to original actions in this court. *Roberts v. Priest*, 334 Ark. 244, 973 S.W.2d 797 (1998); *see Walton v. McDonald*, 192 Ark. 1155, 97 S.W.2d 81 (1936).

### I. Arkansas Constitution, Amendment 7

Turning to the merits of the petitioner's remaining arguments, we first consider the context of Amendment 7. The relevant portion of Ark. Const. amend. 7 provides that:

> The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly[.]

Furthermore, through Amendment 7, the "voters of this state essentially have, *within constitutional limits*, a right to change any law or any provision of our Constitution they deem appropriate." *Donovan v. Priest*, 326 Ark. at 357-58 (citing *Dust v. Riviere*, 277 Ark. 1, 4, 638 S.W.2d 663, 665 (1982)) (emphasis added). According to Amendment 7, the sufficiency of statewide petitions for initiatives shall be decided in the first instance by the Secretary of State subject to the review of this court, which has original and

exclusive jurisdiction over such matters. *Id.* at 357. Initially, the Secretary of State must ascertain and declare the sufficiency of each initiative and referendum within thirty days of filing. However, when a proposed initiative is challenged, Amendment 7 places the burden of proof "upon the person or persons attacking the validity of the petition." *Id.*

## II. The Master's report and findings

We granted expedited consideration of this matter and, pursuant to Ark. Sup. Ct. R. 6-5(a) (1998) and Ark. R. Civ. P. 53, appointed the Honorable Jack Lessenberry as master to conduct proceedings and hearings relating to the signature challenge and to report his factual findings to this court. After hearing testimony for three days and reviewing evidence and exhibits offered by the parties, the master filed his report on September 28, 1998. Significantly, he found that 1,830 signatures counted by the Secretary of State should have been excluded, leaving a deficiency of 975 signatures after subtracting the margin of 855 signatures. Generally, the signatures were excluded due to (1) the absence, insufficiency, or falsity of the canvasser's affidavit; (2) a forgery; or (3) evidence that the petitioner was not a registered voter. In light of these findings, the petitioner submits that Amendment 4 lacks sufficient signatures to appear on the ballot.

Pursuant to Ark. R. Civ. P. 53 (1998), we will accept the master's findings of fact unless they are clearly erroneous. *See also Porter v. McCuen,* 310 Ark. 674, 839 S.W.2d 521 (1992). A finding of fact is clearly erroneous, even if there is evidence to support it, when, based on the entire evidence, the court is left with the definite and firm conviction that the master has made a mistake. *Casteel v. McCuen,* 310 Ark. 568, 569, 838 S.W.2d 364 (1992). In short, the petitioner asks this court to adopt the master's findings of fact and either to enjoin the Secretary of State from placing Amendment 4 on the ballot or to order that any votes cast for the proposed measure not be counted. Petitioner also suggests that the evidence presented to the master clearly indicates that the intervenors ignored and abused the simple requirements of Ark. Const. amend. 7. We agree. Generally, we adopt and affirm the master's findings of fact. However, we do note, as

indicated below, minor discrepancies with individual findings that we hold to be clearly erroneous. Notably, these errors are harmless and insufficient to restore the measure to the ballot.

██ First, we consider 450 signatures excluded by the master and associated with Ms. Cyndi Jarvis. Ms. Jarvis became involved in the petition drive in the fall of 1997 and continued to collect signatures until July 1998, although she testified that she never read the instructions and statement to canvassers printed on each and every petition. Although an initiative and referendum measure must be liberally construed, and only substantial compliance with Ark. Const. amend. 7 is required, the "affidavit of the persons circulating" the petition must be attached to the petition. *See Porter*, 310 Ark. at 678. Each petition in the instant case contained an affidavit to be signed by the canvasser that states in part:

> I, _____, having first duly made oath, state that I personally circulated the above Petition and that each of the above persons signed said Petition in my presence. I further state that to the best of my knowledge and belief each person correctly stated his or her name, residence or town of residence correctly, and that each is a voter of the State of Arkansas.

 When an affidavit is demonstrated to be false, a petition loses its prima facie validity. *See Porter*, 310 Ark. at 677. However, the challenger must also prove that the falsity was conscious and more than inadvertence. *Id.* at 678 (citing *Pafford v. State*, 217 Ark. 734, 233 S.W.2d 72 (1950)). Ms. Jarvis testified that she failed to require petitioners to sign in her presence. Moreover, she left blank petitions at businesses and arranged to pick them up later or to receive them through the mail. If a petition was returned with signature blanks, she merely solicited additional signatures to complete the petition, even by soliciting signatures from other counties. Most disturbingly, Ms. Jarvis whited-out the names of canvassers on petitions she received and replaced the canvassers' names with her own in order to have the petitions notarized. The master also heard testimony from petition signers Lois Williams, Fred Blasscock, Kim Marsh, and Chas Stak, that, although Ms. Jarvis's name appeared on the petition as the canvasser, neither Jarvis nor any other person actually witnessed them signing the petition. Clearly, the master properly

excluded those signatures where Jarvis falsely signed petitions as the canvasser.

However, the master erred by twice excluding sixteen signatures collected by Ms. Jarvis on petition 2004 and introduced as exhibit 34. Although the sixteen signatures were properly excluded once, the master itemized the same exclusion at pages 5 and 11 of his report. Also, the master erred by not counting nine signatures of witnesses who testified that they did sign the Jarvis petition and twenty-one additional signatures of witnesses who, by stipulation of the parties, would have testified to signing the petition. Therefore, we agree with the intervenors' argument that these signatures were rehabilitated, and we hold that the master erred by not counting these thirty signatures. In light of Ms. Jarvis's conscious disregard of the petition instructions, demonstrated by her testimony that she failed to collect signatures personally, received petitions through the mail, and whited-out canvassers' signatures, replacing them with her own, we cannot say that the master was clearly erroneous in excluding 404 of the 450 disputed signatures.

Second, the master excluded 241 signatures that he found to be forgeries. We have long held that the express purpose of Ark. Const. amend. 7 is that petition signatures must be genuine. *Hargis v. Hall*, 196 Ark. 878, 887, 120 S.W.2d 335 (1938). In furtherance of that purpose, Amendment 7 conspicuously contemplates that laws may be enacted "prohibiting and penalizing perjury, forgery, and all other felonies or other fraudulent practices in the securing of signatures or filing of petitions." *Id.* Here, Ms. Linda Taylor, an undisputed expert witness, experienced in the field of identifying handwriting, signatures, and forgeries and trained with the Federal Bureau of Investigation and the Arkansas State Crime Lab, testified that, after reviewing the copies of the petitions filed with the Secretary of State, she found four to five hundred suspicious signatures. After comparing those signatures with available current, known signatures, she concluded, under the legal standard of a high degree of certainty, that 241 signatures were "highly probable forgeries." In light of Ms. Taylor's testimony and the rationale underlying Amendment 7, we

cannot say that the master was clearly erroneous by excluding these 241 signatures as forgeries.

Third, pursuant to the parties' stipulation, the master excluded 221 signatures located on petitions that Mr. Fred Jarvis did not circulate but falsely signed as canvasser. In light of the requirements of Ark. Const. amend. 7 discussed above, we cannot say that the master was clearly erroneous in excluding these signatures.

Fourth, the master considered Mr. Bill Turner's admission that he falsely signed his name as the canvasser on six petitions. In light of this testimony and Amendment 7's requirements, we cannot say that the master was clearly erroneous in excluding twenty-three signatures associated with these petitions.

Given the 404 signatures properly excluded because of Ms. Cyndi Jarvis's conscious disregard of Amendment 7's requirements, the 241 signatures properly excluded as forgeries, the 221 signatures excluded because of Mr. Fred Jarvis's false affidavit, and the twenty-three signatures excluded because of Mr. Bill Turner's false affidavit, the master properly excluded a total of 889 signatures. As noted, the margin of sufficiency as determined by the Secretary of State was 855 signatures. Based on the foregoing, the measure lacks sufficient signatures to be certified for placement on the ballot. However, in the interest of completeness, we address the validity of the remaining, disputed signatures.

Next, we consider sixty-six signatures that were excluded for lack of a notary signature. The intervenors contend that the master erred by excluding twenty of these signatures that had been stamped with Mr. Bill Pugh's facsimile signature. However, the intervenors offer no convincing argument or authority in support of their position. We do not consider assertions of error that are unsupported by convincing legal authority or argument, unless it is apparent without further research that the argument is well-taken. *Grayson v. Bank of Little Rock*, 334 Ark. 180, 971 S.W.2d 788 (1998) (citing *Porter v. Harshfield*, 329 Ark. 130, 139, 948 S.W.2d 83 (1997); *J&J Bonding, Inc. v. State*, 330 Ark. 599, 602, 955 S.W.2d 516 (1997)). In the absence of such argument

and authority, we adopt the master's findings excluding these sixty-six signatures.

██ ██ We also adopt the master's findings excluding the following 792 signatures: 302 signatures with inconsistent signatures of canvassers; forty-five signatures where two canvassers were listed and only one signed or where no signature was found; eighty-seven signatures attributable to Mr. T.J. Glasgow because he testified that he was not present when the petition was signed and was not present when the petition was notarized; nineteen signatures attributed to Ms. Ruth E. Burnett because she testified that she signed as canvasser at her employer's direction although she did not collect the signatures; 198 signatures where the canvasser was absent, did not collect the signatures, or did not sign his affidavit before a notary; and 141 signatures where the canvasser failed to sign his affidavit before a notary. The master heard testimony that petitions were notarized outside the presence of the canvasser and even when the notary had no personal knowledge of canvassers' identities. We have held that the affidavit requires concurrent action on the part of the canvasser and the notary. *See Porter*, 310 Ark. at 678. In light of the foregoing, we cannot say that the master was clearly erroneous in excluding these signatures for absent or deficient affidavits.

██ ██ The intervenors also argue that the master erred by not counting 682 signatures excluded by the Secretary of State because of irregularities in the petition. The master found that the Secretary of State's prima facie review of each page revealed petitions without complete text, petitions with two canvassers indicated but only one signature, the complete absence of a notary, or a failure of the notary to sign. We have held that the full text of a measure must be on the petition in order for the signer to have the opportunity to read it and to inform himself prior to signing the measure. *See Leigh v. Hall*, 232 Ark. 558, 566, 339 S.W.2d 104 (1960). We cannot say that the master was clearly erroneous by not counting these signatures.

██ Additionally, the intervenors contest the exclusion of 1,127 signatures found on petitions that were never tendered to the Secretary of State. Mr. John Hoyle, the intervenor and a

leader in the petition drive, testified that he and others delivered petitions to the Secretary of State on Thursday, July 2, 1998. Upon his return home, he received several additional petitions in that day's mail and via a Federal Express delivery. Notably, the master's report indicates that these 1,127 signatures were not timely tendered to the Secretary of State but, in fact, were disclosed by the intervenors only after the inception of this case. Accordingly, we decline to say that the master was clearly erroneous by not counting these signatures.

Finally, the intervenors contend that the Secretary of State improperly excluded 765 signatures of nonregistered voters. Both the respondent and the petitioner justify the exclusion on the basis that these petitioners were not registered voters at the time the petition was notarized. We agree that these signatures were properly excluded, but we note that the petition signer must have been a registered voter at the time he signed the petition. Pursuant to Ark. Code Ann. § 7-9-101(8) (Supp. 1997), a "legal voter" is a person who is registered at the time of signing the petition pursuant to Ark. Const. amend. 51, which provides that voter registration is not final until the permanent registrar receives and acknowledges acceptance of a voter-registration application. Accordingly, the Secretary of State properly excluded the signatures of 765 individuals who were not registered by the date of notarization, a date even later than the signing of the petition. We cannot say that the master was clearly erroneous in not counting these signatures.

We have long observed that we do not enjoy being in the "last minute" of review. *See Scott v. Priest*, 326 Ark. 328, 334, 932 S.W.2d 746 (1996) (citing *Page v. McCuen*, 318 Ark. 342, 884 S.W.2d 951 (1994)). We also acknowledge that the people of Arkansas deserve an initiative and referendum procedure that "allows them the confidence that measures, after having been adequately reviewed, will not be removed from the ballot." *Id.* at 334-35. Recognizing that the "sponsors of proposals should also be assured [that] their ballot titles and proposed measures meet required guidelines and rules before they spend their time, energy and monies in getting their proposal before the voters," *id.* at 334, we again exercise our jurisdiction and strongly advise sponsors of

initiated constitutional amendments that the onus of complying with the simple and straightforward procedural requirements of Ark. Const. amend. 7 lies solely with the sponsor of the proposed constitutional amendment, regardless of the substantive nature of the measure. Where, as here, the sponsor fails to comply with and ignores and abuses these simple procedural requirements, established by our Constitution to protect all the residents and taxpayers of Arkansas, neither the Secretary of State nor this court can cure such a deficiency resulting solely from the sponsor's conscious disregard of the Constitution's requirements.

Accordingly, we hold that proposed Amendment 4 lacks sufficient signatures to satisfy the requirements of Ark. Const. amend. 7, and we grant the instant petition to enjoin its placement on the November 3, 1998, ballot. Alternatively, we hold that any votes cast on proposed Amendment 4 not be counted or certified. We also shorten the time for issuance of mandate and direct that any petition for rehearing must be filed on or before October 20, 1998.

GLAZE and CORBIN, JJ., concur.

TOM GLAZE, Justice, concurring. I concur and write on points not mentioned in the majority opinion. First, it is well settled that the states have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997); *Bullock v. Carter*, 405 U.S. 134 (1972); but *see Meyer v. Grant*, 486 U.S. 414 (1988) (where Colorado law prohibiting paid circulators of initiative petitions held to have abridged petitioners' right to engage in violation of the First and Fourteenth Amendments because, among other things, the state failed to demonstrate placing the statutory burden on the petitioners to hire circulators would protect the integrity of its initiative process). In the present case, the Arkansas statutes with which the Hoyle petitioners were required to comply in gathering voters' signatures are entirely reasonable so as to ensure the State's initiative process will not be abused. That being said, the majority court quite properly excluded signatures which resulted from canvassers and notaries who consciously disregarded Arkansas law. Consequently, those

signatures were falsely obtained and justifiably excluded by this court's master.

On a second point, Hoyle suggests the Secretary of State erred when she excluded 765 signatures of persons who were not registered to vote when they signed the initiative petition. He claims that while Amendment 7 to the Arkansas Constitution requires the signer of an initiative petition to be a "legal voter," the signer need only be a "qualified elector." Hoyle contends a qualified voter is a person eighteen years old or older, who resides in the State, and has committed no felony. Mr. Hoyle is wrong. Act 963 of 1995, compiled as Ark. Code Ann. 7-1-101(10) (Supp. 1997), defines "qualified elector" as a person who holds the qualifications of an elector *and* who is registered pursuant to the Arkansas Constitution Amendment 51 (Arkansas's Voter Registration Amendment). Quite obviously, if initiative-petition signers were not required to be registered voters, the Secretary of State would have no list of voters to verify petitions circulated pursuant to Amendment 7.

Finally, the majority opinion cites *Page v. McCuen*, 318 Ark. 342, 884 S.W.2d 951 (1994), and *Scott v. Priest*, 326 Ark. 328, 932 S.W.2d 746 (1996), wherein we noted the court's displeasure in being placed in the position of reviewing initiative petitions and proposals at the last minute. In *Scott*, we noted that the General Assembly had acted responsibly to correct this last-minute review problem by referring to the voters at the November 5, 1996 General Election a measure that would have provided a procedure that would assure voters that the petitions they signed would actually place the measure on the General Election ballot, if the sponsors obtained the necessary number of signatures. The voters defeated that proposed measure at the polls in the 1996 election by a vote of 368,460 against and 317,970 for. Exactly why the voters rejected this referendum measure in 1996 is unclear.

What *is* clear is that Arkansas's laws dealing with initiative and referendum measures remain restrictive, at least to the extent that no early review can be made by this court so a proposed measure can be assured placement on the General Election ballot for a vote of the people. As the court forecast in *Page*, until appropriate

action is taken to correct the problems attendant to proposals submitted under Amendment 7, Arkansas citizens can continue to expect measures to be removed from the ballot immediately prior to the election.

The options available to correct this continuing problem are few. One, this court, which admittedly added its restrictive interpretation to Amendment 7 by a 4-3 decision in *Finn v. McCuen*, 303 Ark. 418, 798 S.W.2d 34 (1990), could be asked to revisit that decision. In *Finn*, this court considered the validity of Act 280 of 1989 which provided a reasonable time table for all questions concerning a ballot title or popular name be resolved. Our court interpreted Act 280 to be in conflict with Amendment 7 and held the Act unconstitutional, but there were three written dissents seeing the Act differently. Eventually, the General Assembly referred a proposed measure, which was almost identical to Act 280, in an effort to provide a short constitutional time table to correct the late-review aspect of Arkansas's initiative process, as interpreted by our court, but the voters rejected that measure. Thus, a second option is that the General Assembly might again refer another proposed measure to the Arkansas voters so the voters can have a second chance to consider the restrictive-initiative process problem. A third avenue, of course, is that a First and Fourteenth Amendment challenge may be brought against Amendment 7 itself, to determine whether Arkansas's initiative measure process is presently so burdensome that it fails to meet constitutional muster under the United States Constitution.

Whatever option is eventually taken to obtain a fair initiative process under Arkansas law, I renew my remarks that the signature-gathering aspects of Arkansas's election laws are reasonable and are properly designed to ensure that sponsors of initiative proposal measures are honestly and fairly placed on the General Election ballot. Because those Arkansas laws were consciously ignored in this case, I have no hesitancy in joining the majority court in holding the Hoyle petition to be insufficient.

CORBIN, J., joins this opinion.