Cite as 2024 Ark. 146

# SUPREME COURT OF ARKANSAS

**No.** CV–24–492

|  |  |
|---|---|
|  | **Opinion Delivered:** October 14, 2024 |
| JENNIFER MCGILL, INDIVIDUALLY AND ON BEHALF OF THE ARKANSAS CANVASSING COMPLIANCE COMMITTEE; AND CHEROKEE NATION ENTERTAINMENT, LLC<br>PETITIONERS | AN ORIGINAL ACTION |
| V. | PETITION DENIED. |
| JOHN THURSTON, IN HIS CAPACITY AS ARKANSAS SECRETARY OF STATE<br>RESPONDENT |  |
| LOCAL VOTERS IN CHARGE, A BALLOT QUESTION COMMITTEE; AND JIM KNIGHT, INDIVIDUALLY AND ON BEHALF OF LOCAL VOTERS IN CHARGE<br>INTERVENORS |  |

**COURTNEY RAE HUDSON, Associate Justice**

Petitioners Jennifer McGill, individually and on behalf of the Arkansas Canvassing Compliance Committee, and Cherokee Nation Entertainment, LLC (CNE), filed this original action challenging the sufficiency of a proposed constitutional amendment (Proposed Amendment) regarding the Pope County casino license. The petitioners'

two-count petition alleges that the decision of respondent John Thurston, in his official capacity as Arkansas Secretary of State (Secretary), to certify the Proposed Amendment was invalid. In Count I, the petitioners allege that the number of signatures collected is insufficient once invalid signatures are removed from the Secretary's count. In Count II, the petitioners allege that the popular name and ballot title are insufficient. Local Voters in Charge (LVC), a ballot question committee and sponsor of the Proposed Amendment, and Jim Knight, individually and on behalf of LVC, moved to intervene in this action. In *McGill v. Thurston*, 2024 Ark. 120, at 1 (per curiam), we granted expedited consideration of the petition and the motion to intervene. We bifurcated the proceedings of Count I and Count II and set separate briefing schedules. As to Count I, we appointed Special Master Randy Wright to resolve the factual disputes raised in the petition. This opinion addresses Count I, the number of valid signatures, while Count II will be addressed separately. We have jurisdiction pursuant to Arkansas Supreme Court Rule 6-5. We deny Count I of the petition.

LVC sponsored an initiative petition for a proposed amendment to Amendment 100 of the Arkansas Constitution to require local voter approval for certain new casino licenses; repeal authority to issue a casino license in Pope County; and revoke any license issued for a casino in Pope County, Arkansas. Between April and late June 2024, paid canvassers circulated this initiative petition throughout Arkansas to obtain sufficient signatures of registered voters to have the Proposed Amendment placed on the ballot for the November 2024 general election. On July 31, 2024, the Secretary determined that LVC had submitted

no less than 116,200 signatures, exceeding the required 90,704, and certified the Proposed Amendment to appear on the November 2024 ballot.

Petitioners now challenge the Secretary's certification of the Proposed Amendment, alleging that Arkansas laws governing paid canvassers were violated in the initiative-petition effort. Petitioners originally argued that LVC (1) unlawfully paid bonuses or otherwise compensated canvassers based on the number of signatures a canvasser collected; (2) failed to certify that all canvassers had no disqualifying criminal offenses; (3) used canvassers who were not qualified as canvassers due to having disqualifying offenses; (4) failed to register as paid canvassers individuals who solicited signatures while "coaching" canvassers in real time and thus qualified as paid canvassers in their own right; (5) employed canvassers that were not Arkansas residents; (6) failed to properly train and instruct canvassers; and (7) otherwise failed to register and certify numerous paid canvassers.

On August 27–30, 2024, the special master heard evidence on those claims brought by petitioners in Count I. In his forty-page final report, the special master disagreed with petitioners' claim that LVC did not provide the required certifications under section 7-9-601(b)(3) (Supp. 2023), and he concluded that agents of LVC properly made the required certifications that no paid canvasser had a disqualifying offense. The special master also determined that LVC was not in violation of the pay-per-signature ban in section 7-9-601(g). He found for LVC on its affirmative defense of estoppel, which was based on the Secretary's prior acceptance of LVC's paid-canvasser affidavits. The special master disqualified 5,966 signatures for incorrect residence addresses on petition-part affidavits. Last,

3

the special master found "that any other claims made by the Petitioners should be denied for lack of proof," leaving "no less than 110,234 validated signatures."

In their opening brief, petitioners challenge the special master's findings only on the sponsor-certification and pay-per-signature claims, thus abandoning all other claims that the special master denied for a "lack of proof." The portions of the record and the special master's findings pertinent to these two remaining claims are set forth below.

On March 22, 2024, LVC executed a contract with PCI Consultants, Inc. (PCI), to gather signatures. Among other things, the contract required (1) that LVC provide each petition circulator and/or petition circulator manager with approved educational talking points for use in describing the ballot measure; (2) that PCI obtain a 65 percent validity rate, including checking signatures against voter files supplied by LVC; and (3) that PCI submit a weekly report to LVC. The contract also expressly authorized PCI to hire "employees and/or contract with independent contractors to assist [PCI] in the performance of its duties under this Agreement."

LVC committee member Hans Stiritz testified that he understood PCI would hire whomever it needed to carry out the canvassing. Consequently, PCI entered separate contracts with three entities: (1) Florida Petition Management (FPM); (2) Cape Campaigns; and (3) Engage the Voter. FPM hired Phil Dewey to run an office in North Little Rock. Stephanie Marcynyszyn of Cape Campaigns managed another canvassing office. Berta, or "Ashley," Erickson of Engage the Voter managed an office in Northwest Arkansas. Dewey, Marcynyszyn, and Erickson signed the sponsor affidavits submitted by LVC to register its paid canvassers. Each affidavit states, "I am providing this affidavit on behalf of and at the

4

direction of Local Voters in Charge, a duly formed Arkansas Ballot Question Committee and Sponsor . . . ."

LVC hired Nicole Gillum, an Arkansas attorney, to provide legal compliance related to the signature gatherers. Gillum explained at the hearings how LVC operated. She testified that PCI's CEO contracted with three LLCs to be "managers on the ground here for this campaign." Gillum served as LVC's usual contact with PCI, and PCI relayed to the canvassing managers Gillum's instructions on behalf of LVC. Gillum provided PCI advice for the managers who were onboarding and training canvassers for LVC, including instructions on how LVC wanted the work completed. She also provided instructions for canvasser training, background checks, and submissions to the Secretary's office on behalf of LVC. Gillum and others drafted the contractually required fact sheet that the canvassing managers used. She stated that she spoke with Dana Alpin-Gonzalez of PCI three to four times a day about background checks, and Gillum cleared canvassers to be registered. Gillum drafted the sponsor affidavits used by Dewey, Marcynyszyn, and Erickson, and she directed that they sign them on behalf of LVC. Gillum also checked all sponsor affidavits emailed to the Secretary's office to confirm that they were correct.

Gillum, Alpin-Gonzalez of PCI, PCI's CEO Angelo Paparella, Josh Bridges, the Secretary's assistant director of elections, and Leslie Bellamy, Director of Elections for the Secretary, met on April 12, 2024, before any signatures were collected on behalf of LVC. At that meeting, Gillum told Bridges and Bellamy that PCI was LVC's canvassing company and that Alpin-Gonzales of PCI would be making the sponsor submissions. Afterward, Bridges accepted all of the sponsor submissions made by Alpin-Gonzales on LVC's behalf.

5

Dewey testified that PCI hired his employer, FPM, to manage the petition drive for LVC as well as to hire and train canvassers to collect signatures on the petition. Dewey hired his own set of approximately 250 canvassers. Dewey testified in detail about the training process that canvassers underwent when they were onboarded and then again when they were hired after their background checks had cleared. This training included using the fact sheet that was created by LVC. Dewey also executed the sponsor affidavits at the direction of Alpin-Gonzalez on behalf of LVC.

Petitioners argued that LVC's pay-per-signature violations were so systemic that all signatures collected must be disqualified. In support of that theory, petitioners introduced videos showing their investigators questioning canvassers about how they were paid. Some videos purported to show that, in addition to compensating canvassers on an hourly basis, Dewey gave gift cards to those who collected at least 75–100 signatures in a day. Dewey admitted that canvassers knew they could be eligible to draw for a prize for several reasons, including having a "good day" by collecting 100 signatures, but he testified that it "wasn't really assigned to a number because somebody could have brought in 150 and then drew and somebody could have brought in 75 and drew out of it."

In three of the videos, the alleged canvassers were never identified. In another video, the alleged canvasser states that her name is "Veronica," but the final list of LVC's paid canvassers who submitted petition parts does not contain a canvasser with that name. In other videos, the canvasser says they "might" get a gift card if they get 100 or 200 signatures or be entered into a raffle to win a television. In 14 videos, at most, the canvasser mentions getting, or being eligible for, $100 for 100 signatures or getting paid $4 or $5 per signature.

6

In those same videos, however, at least five of the paid canvassers also state that they are being paid hourly. Petitioners did not introduce evidence of when a particular canvasser drew for a prize, who made the offer to pay $100 for 100 signatures, when it was purportedly made to any of the canvassers, or the number of signatures the canvassers collected because of the alleged offer. [1]

After the hearings concluded, the special master found that "the evidence presented by all parties mandates the finding that LVC, the sponsor, used as agents others working under the sponsorship of LVC, to collect signatures to be presented to the Respondent." He also found that LVC authorized PCI and the three canvassing managers to act on its behalf and subject to its control. Regarding the language of Arkansas Code Annotated section 7-9-601(b)(3), the master found that it does not limit "sponsor" to a ballot question committee member or state that the certification is nondelegable. He determined that "[i]t would be impractical to find that the named sponsor, LVC, could not use authorized persons or entities to do the actual canvassing and managing of the petition question." The master therefore found that LVC properly certified to the Secretary that each paid canvasser in the sponsor's employ had no disqualifying offenses under Arkansas Code Annotated section 7-9- 601(b)(3).

The special master also determined that, with regard to the pay-per-signature claim,

> [i]t is incumbent upon the master to consider as a whole the credibility of the
> facts contained in the above described exhibits and what each exhibit purports

---

[1]Petitioners reference intervenor's exhibit 9 as a means of further showing a violation of section 7-9-601(g); however, that exhibit was not properly admitted by intervenors at the hearing and is not in the record before us. Petitioners filed a motion to supplement the record to include that exhibit, but we deny the motion.

to prove as to the paid canvassers method of payment. The master took into account that there were 338 paid canvassers who submitted signatures to the Respondent for this ballot measure, and the above described exhibits would at best only be 14 paid canvassers. (There were not totals of signatures collected of the 14 paid canvassers listed in the videos.) The master does not find that the Intervenors were in violation of Section 7-9-601(g)(1). It is further found the Petitioners did not meet their burden of proof of showing that the Intervenors, in their collection of signatures, conducted such with a wanton disregard for the provisions of Section 7-9-601(g)(1) that would require all signatures collected to be disqualified.

*Analysis*

In original actions, we will accept the special master's findings of fact unless they are clearly erroneous. *Stilley v. Thurston*, 2024 Ark. 124, at 3 (citing *Roberts v. Priest*, 334 Ark. 503, 975 S.W.2d 850 (1998)). A finding of fact is clearly erroneous when, even if there is evidence to support it, based on the entire evidence, the court is left with the definite and firm conviction that the special master has made a mistake. *Id*. Issues of statutory interpretation are reviewed de novo. *Zook v. Martin*, 2018 Ark. 306, 558 S.W.3d 385 (citing *State v. Ledwell*, 2017 Ark. 252, 526 S.W.3d 1). We construe statutes as they are read, giving the words their ordinary and usually accepted meaning in common language. *McMillan v. Live Nation Ent., Inc.*, 2012 Ark. 166, 401 S.W.3d 473. Statutes are to be construed so that no word is left void, superfluous, or insignificant, and we give meaning to every word in the statute, if possible. *Williams v. St. Vincent Infirmary Med. Ctr.*, 2021 Ark. 14, 615 S.W.3d 721. Statutory provisions are construed to make them consistent, harmonious, and sensible to give effect to every part. *Ark. Parole Bd. v. Johnson*, 2022 Ark. 209, 654 S.W.3d 820.

I.    *LVC's Compliance with Arkansas Code Annotated Section 7-9-601(b)(3)*

Petitioners first argue that LVC failed to comply with section 7-9-601(b)(3). Petitioners contend that LVC could not delegate its certification obligation "to an agent

outside of the LVC—that is, someone who is not an officer, member, or employee of the sponsor." The Secretary also argues that LVC, as the "sponsor," could not substitute any other person to make the certification.

Arkansas Code Annotated section 7-9-601(b)(3) provides that "[u]pon submission of the sponsor's list of paid canvassers to the Secretary of State, the sponsor shall certify to the Secretary of State that each paid canvasser in the sponsor's employ has no disqualifying offenses in accordance with this section." Additionally, "sponsor" is defined as "a person who arranges for the circulation of an initiative or referendum petition or who files an initiative or referendum petition with the official charged with verifying the signatures." Ark. Code Ann. § 7-9-101(10) (Repl. 2018). The term "person" is also defined as "any individual, business, proprietorship, firm, partnership, joint venture, syndicate, business trust, labor organization, company, corporation, association, committee, or any other organization or group of persons acting in concert." Ark. Code Ann. § 7-9-402(11)(A) (Repl. 2018). Considering the plain language of these statutory definitions, a wide range of groups or people can qualify as "the sponsor" for purposes of section 7-9-601(b)(3).

Here, LVC contracted with PCI, who in turn contracted with three separate canvassing companies, to gather signatures in support of the ballot initiative. Together, these three groups acted in concert to arrange for the circulation of an initiative petition and to then file the petition with the Secretary. We conclude that under the broad statutory definition of "sponsor," found in Ark. Code Ann. §§ 7-9-101(10) and −402(11)(A), Dewey, Marcynyszyn, and Erickson were eligible to sign the certification. As a result of our conclusion, we need not address the estoppel argument raised by LVC.

9

II.      *LVC's compliance with Arkansas Code Annotated section 7-9-601(g)(1).*

Petitioners next argue that the special master erred in finding that petitioners did not carry their burden of establishing violations of the pay-per-signature prohibition in Arkansas Code Annotated section 7-9-601(g)(1). They cite (1) Dewey's admission that he paid canvassers additional money when they had a good day; (2) videos of different canvassers who mentioned eligibility for a $100 bonus if they collected 100 signatures; and (3) evidence of gift-card purchases. According to petitioners, these "violations" require a categorical disqualification of all validated signatures obtained by all paid canvassers in Dewey's employ. Petitioners, however, are incorrect.

> The pay-per-signature ban is found in section 7-9-601(g), which provides that
>
> (g)(1) It is unlawful for a person to pay or offer to pay a person, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition or statewide referendum petition.
>
> (2) This subsection does not prohibit compensation for circulating petitions but only compensation for obtaining signatures when the compensation or compensation level is impacted by or related to the number of signatures obtained.
>
> (3) A signature obtained in violation of this subsection is void and shall not be counted.
>
> (4) A violation under this subsection is a Class A misdemeanor.

The plain language of subdivision (g)(3) requires proof of a causal link between the alleged violation and the signatures obtained as a result of the alleged violation. There is no categorical exclusion under section 7-9-601(g). Thus, only the signatures obtained due to

10

an impermissible payment or offer to pay are "void and shall not be counted." Ark. Code Ann. § 7-9-601(g)(3).

While petitioners produced multiple videos as proof of an unlawful offer to pay under subdivision (g)(1), they never offered evidence of the total number of signatures collected by the 14 paid canvassers recorded in the videos. Furthermore, none of those paid canvassers reported when they were offered $100 for 100 signatures or who made the unlawful offers. An improper offer without more is not enough to invalidate signatures. *See Walther v. FLIS Enters., Inc.*, 2018 Ark. 64, at 11, 540 S.W.3d 264, 270 ("We do not interpret language to render one section dispensable." (citing *Ozark Gas Pipeline Corp.*, 342 Ark. 591, 29 S.W.3d 730 (2000); *Surplusage Canon, Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts* 174–79 (2012))). Additionally, the special master found that petitioners' videos were not credible evidence of violations of subdivision (g)(1), and Dewey's testimony supports this finding.

As petitioners have not provided any argument or convincing authority showing that the special master clearly erred in his rejection of petitioners' claims, we deny the petition on Count I.

Petition denied.

Mandate to issue immediately.

*David A. Couch*; *McDaniel Wolff, PLLC*, by: *Scott P. Richardson, Bart W. Calhoun*, and *Brittany D. Webb*; *Quattlebaum, Grooms & Tull PLLC*, by: *John E. Tull III, E.B. Chiles IV, R. Ryan Younger, Meredith M. Causey*, and *Glenn Larkin*, for petitioners.

*Tim Griffin*, Att'y Gen., by: *Jordan Broyles*, Sr. Ass't Att'y Gen., *Christine A. Cryer*, Sr. Ass't Att'y Gen., and *Justin Bracher*, Ass't Att'y Gen., for respondent.

*Friday, Eldredge & Clark, LLP*, by: *Elizabeth Robben Murray*, *Kimberly D. Young*, *Kristopher B. Knox*, and *Kathy McCarroll*, for intervenors.